882 So.2d 890 (2004)
Clyde Timothy BUNKLEY, Petitioner,
v.
STATE of Florida, Respondent.
No. SC01-297.
Supreme Court of Florida.
May 27, 2004.
R. John Cole, II, Sarasota, FL, for Petitioner.
Charles J. Crist, Jr., Attorney General, and Katherine V. Blanco, Senior Assistant Attorney General, Tampa, FL, for Respondent.

ON REMAND
BELL, J.
This case is before the Court on remand from the United States Supreme Court for reconsideration of our decision in Bunkley v. State, 833 So.2d 739 (Fla.2002), vacated, *891 538 U.S. 835, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003). We have jurisdiction under article V, section 3(b)(4) of the Florida Constitution and reaffirm our decision in Bunkley.

FACTS AND PROCEDURAL HISTORY
The facts are set out fully in this Court's initial opinion on review. Bunkley, 833 So.2d at 740-41. In 1986, Bunkley burglarized a closed, unoccupied restaurant. When he was arrested, he had in his pocket a folding knife with a blade shorter than four inches. The knife had been folded in his pocket at all times during the burglary. Bunkley was charged with armed burglary. To prove the offense under section 810.02(2)(b), Florida Statutes (1985), the State had to prove that Bunkley was armed with a "dangerous weapon." The applicable statutory definition of a "weapon" in section 790.001(13), Florida Statutes (1985), excluded a "common pocketknife." Specifically, this statute defined a "weapon" as "any dirk, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, or other deadly weapon except a firearm or a common pocketknife." The term "common pocketknife" is not statutorily defined.
That Bunkley's knife was a "dangerous weapon" and not an excepted "common pocketknife" was a basic element of the offense the State had to prove to the jury. To establish this element at trial, the arresting officer told the jury that Bunkley had "a good-sized buck knife." The officer said that the blade, which folded into the handle, was about two-and-one-half to three inches long. The officer testified further that Bunkley's knife blade locked in the open position. The officer explained how this feature distinguished it from a common pocketknife:
It's a locked blade, which makes it a dangerous weapon for the simple fact that an average pocketknife, if you stick something with it and you're not very good at what you do, the blade will close. The pocketknife has that safety feature, that it will close. This blade will not close unless you push down very hard on this spring.
On cross-examination, Bunkley acknowledged that the knife could cut a throat and could be considered a dangerous weapon. In closing argument, the prosecutor described the blade as thick and capable of being locked in an open position, unlike a common pocketknife. Because the knife was admitted into evidence, the jurors could examine it for themselves.
The jury, having heard the evidence, considered the arguments of counsel, and received from the trial judge the proper instruction on the law applicable to the charged offense,[1] concluded Bunkley's *892 knife was a dangerous weapon, not a common pocketknife, and convicted him of armed burglary, possession of burglary tools, and resisting arrest without violence. The court entered judgment in April 1987. On the armed burglary conviction, the court sentenced Bunkley to life imprisonment in accordance with the sentencing guidelines. The sentence was based in part on Bunkley's fifteen prior convictions, fourteen of which were related to burglary. The Second District Court of Appeal affirmed Bunkley's conviction without opinion. Bunkley v. State, 539 So.2d 477 (Fla. 2d DCA 1989) (table).[2]
Bunkley filed two motions for postconviction relief, challenging the jury's finding that he was armed with a dangerous weapon. The Second District Court of Appeal affirmed the denial of one of Bunkley's motions, Bunkley v. State, 569 So.2d 447 (table) (No. 90-02681), and struck the appeal from the denial of the other motion. Bunkley v. State, 569 So.2d 447 (Fla. 2d DCA 1990) (table) (No. 90-02568). Bunkley also filed two federal habeas petitions in which he argued that he could not be convicted of armed burglary because his knife was a common pocketknife excluded from the section 790.001(13) definition of a weapon. The federal district court denied Bunkley relief. Bunkley v. Singletary, No. 96-405-CIV-T-24C (M.D.Fla. Feb. 26, 1999); Bunkley v. Dugger, No. 91-113-CIV-T-99B (M.D. Fla. June 1, 1993). Bunkley also filed a petition to invoke all writs in this Court, which we denied without opinion in July 1995. Bunkley v. State, 660 So.2d 712 (Fla.1995) (table).
In 1997, eight years after Bunkley's conviction and sentence became final, we decided L.B. v. State, 700 So.2d 370 (Fla.1997), in which we interpreted the "common pocketknife" exception to the section 790.001(13) definition of a "weapon."[3] We held in L.B. that the petitioner's knife, which had a three-and-three-quarter-inch blade, fell within the "common pocketknife" exception. Id. at 373. In reaching that conclusion, we cited a 1951 Florida Attorney General's opinion which stated that a pocketknife with a blade of four inches or less is a common pocketknife. Id. (citing Op. Att'y Gen. Fla. 51-358 (1951)). Based on the L.B. decision, Bunkley applied for postconviction relief under Florida Rule of Criminal Procedure 3.850. Bunkley argued that under the L.B. definition of a "common pocketknife," his knife *893 with its three-inch blade was excluded from the statutory definition of a "weapon," so that he could not be convicted of armed burglary.
The circuit court dismissed Bunkley's rule 3.850 motion, and the Second District Court of Appeal affirmed, but certified to us the question of whether L.B. was to be applied retroactively. Bunkley v. State, 768 So.2d 510 (Fla. 2d DCA 2000). In answering the Second District's certified question, we determined that L.B. constituted a "change" not a "clarification" in the law. We expressly looked at the decision in Fiore v. White, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), but rejected its applicability to Bunkley. We determined that, "as opposed to `changes' in the law, an entirely separate body of precedent, i.e. `clarifications' in the law, has no application under Florida law in the context of retroactivity." Bunkley 833 So.2d at 744. Applying our well-established law on retroactivity, we held that L.B. did not apply retroactively to Bunkley's case and approved the Second District's decision. Bunkley v. State, 833 So.2d 739, 746 (Fla.2002). We explained that only a "jurisprudential upheaval," defined as a "major constitutional change of law," justified retroactive application. Id. at 744 (citing Witt v. State, 387 So.2d 922, 929-30 (Fla.1980)). We concluded that L.B. was, instead, a mere "evolutionary refinement" in the law, and thus would not be applied retroactively. Bunkley, 833 So.2d at 745.
Justice Pariente, in a dissent joined by Chief Justice Anstead, argued that Bunkley's conviction violated the due process principles of Fiore v. White, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001). Fiore held that due process is violated by a conviction based on conduct that a "criminal statute, as properly interpreted, does not prohibit." Id. at 228, 121 S.Ct. 712. The Bunkley dissent argued that L.B. did not change or refine the law but merely clarified the existing interpretation of a "common pocketknife" under the statute. Bunkley, 833 So.2d at 747 (Pariente, J., dissenting). According to the dissent, L.B."correctly stated the law at the time Bunkley's conviction became final." Bunkley, 833 So.2d at 747 (Pariente, J., dissenting). Thus, the dissent stated that under 1989 law (as clarified by L.B. in 1997), Bunkley carried a "common pocketknife" excepted from the statutory definition of a "weapon," so he could not be convicted of armed burglary. Bunkley, 833 So.2d at 747. Bunkley then filed a pro se petition for writ of certiorari to the United States Supreme Court.
The United States Supreme Court granted certiorari from and vacated this Court's decision. Bunkley v. Florida, 538 U.S. 835, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003). The Supreme Court remanded the case with instructions to consider whether, in light of Fiore and L.B., Bunkley was convicted without proof of one of the elements of the crime. The Supreme Court accepted this Court's conclusion that L.B. changed the law. Bunkley, 123 S.Ct. at 2023. However, the Supreme Court noted that this Court said L.B. culminated a "century-long evolutionary process" in the law on the "common pocketknife" exception. Id. The Supreme Court could not determine whether L.B. changed the law from 1989 when Bunkley's conviction became final or whether L.B. merely clarified the law as it had existed in 1989. Id.
Consequently, the United States Supreme Court said that the question under Fiore, left unanswered by our decision in Bunkley, was whether a two-and-one-half-to three-inch pocketknife was a "weapon" under the statute in 1989. Bunkley, 123 S.Ct. at 2024. If Bunkley's pocketknife was not a "weapon" under the statute when his conviction became final in 1989, *894 then his conviction violated Fiore's due process principles. On the other hand, if Bunkley's knife could have been a "weapon" under the statute in 1989, then Bunkley's conviction stands.

FLORIDA LAW IN 1989
In answer to the United States Supreme Court's question, we clarify that Bunkley's conviction was proper under Florida law in 1989. Basically, in light of both Fiore and L.B., Bunkley was not convicted without proof of one of the elements of his crime. Bunkley's knife could have been a "dangerous weapon" under both the statute and the decisional law at that time. In 1989, whether Bunkley's knife was a weapon was properly a factual determination for his jury. Having heard the evidence and having received proper instructions on the law, Bunkley's jury unanimously determined that his knife was a dangerous weapon, not a common pocketknife. The evolutionary refinement in our decisional law made eight years later in L.B. has no retroactive application under either Florida's well-established law on retroactivity or Fiore. The support for this conclusion is found in our prior decision, the prior federal habeas petition decisions, and the discussion below.
Bunkley was convicted of armed burglary under a statute defining the offense as simple burglary while the defendant is armed with a "dangerous weapon." § 810.02(2)(b), Fla. Stat. (1985). At the time of Bunkley's trial in 1987, whether or not a particular knife was a "dangerous weapon" under the statute was determined by juries based on the facts of each case after receiving proper instructions on the law. In Bunkley's case, the jury determined that Bunkley's knife was a "dangerous weapon," not a common pocketknife. And, because he was armed with a dangerous weapon, he was guilty of armed burglary.
The decisional law of Florida was clear in 1989 that the determination of whether Bunkley's knife was a dangerous weapon or an exempted common pocketknife was ordinarily a question of fact for a properly instructed jury, not a pure question of law. Of particular importance, this position is confirmed by State v. Ortiz, 504 So.2d 39, 40 (Fla. 2d DCA 1987). Ortiz was charged with possession of a concealed weapon, not armed burglary, but he relied on the same statutory exception on which Bunkley relies. He filed a motion to dismiss because the charge was based on his pocketknife, and the definition of a "weapon" under section 790.001(13) excludes a "common pocketknife." Ortiz, 504 So.2d at 40. The trial court granted the motion to dismiss. The Second District Court of Appeal reversed. Although there was no factual dispute about the characteristics of the knife, the Second District held that "whether a knife is a `common pocketknife' ordinarily involves a factual determination which may not be made by a trial court" on a motion to dismiss. Id.
While Ortiz was decided in the context of a motion to dismiss, the Second District has repeatedly affirmed that the Ortiz decision rested on the rule that "whether the knife was a common pocketknife was a question of fact that must be resolved by a jury." Baldwin v. State, 857 So.2d 249, 252 (Fla. 2d DCA 2003) (citing Ortiz, 504 So.2d at 40), review dismissed, 865 So.2d 479 (Fla.2003); see also Mitchell v. State, 698 So.2d 555, 561 (Fla. 2d DCA 1997) (citing Ortiz for the rule that "whether a pocketknife is a weapon is a factual question for the jury"), approved, 703 So.2d 1062 (Fla.1997); Bell v. State, 673 So.2d 556 (Fla. 1st DCA 1996) (affirming a defendant's convictions for concealed weapons offenses and citing Ortiz for the rule that whether a knife qualified as a "weapon" *895 under section 790.001(13) is a jury question).
Ortiz was decided on March 13, 1987, one month before Bunkley's trial began on April 13, 1987. Ortiz remained the law beyond 1989 when Bunkley's conviction became final. Indeed, the Second District's decision in L.B. confirms the rule that whether a knife fell within the "common pocketknife" exception was a jury question. In L.B., the Second District rested upon this fact when it held that the "common pocketknife" exception to the statutory definition of weapon was void for vagueness. L.B. v. State, 681 So.2d 1179, 1181 (Fla. 2nd DCA 1996), rev'd, 700 So.2d 370 (Fla.1997). In support of its conclusion, the Second District observed that "the statute impermissibly leaves the question of whether a specific pocketknife is or is not a weapon to the `whim of a jury.'" Id. at 1180. The Second District also cited with approval the trial court's conclusion that "no per se test could be applied to determine whether the [defendant's] knife, as a matter of law, fell within the exception." Id.
This Court reversed the Second District's decision. We expressly held that the statute was not void for vagueness. See L.B. v. State, 700 So.2d 370, 373 (Fla.1997).[4] Indeed, this Court in L.B. recognized the rule that whether a knife is a "common pocketknife" is a jury question, and stated that in most cases the answer will be obvious to fact-finders. L.B., 700 So.2d at 372. Even though juries might reach inconsistent results based on similar facts, L.B. stated that this is an acceptable consequence of our jury system. Id. at 373. Thus, Florida law at the time of *896 Bunkley's conviction unquestionably approved the referral to a jury of the question of whether a specific pocketknife qualified as a "weapon" under the section 790.001(13) definition, or, specifically to Bunkley, as a "dangerous weapon" under section 810.02(2)(b).
In sum, at the time of Bunkley's conviction juries were given the instructions previously noted and it was up to them to determine unanimously as a question of fact whether or not a particular pocketknife was a "dangerous weapon" or a "common pocketknife." Thus, as a matter of statutory and decisional law in 1989, Bunkley's jury could permissibly conclude that a folding knife with a three-inch blade carried closed in a burglar's pocket was a "dangerous weapon." And as the federal district court observed in rejecting Bunkley's claim in his first habeas petition, the evidence presented at trial regarding Bunkley's buck knife "clearly provided sufficient evidence for the jury to find that the petitioner was armed with a dangerous weapon." Bunkley v. Dugger, No. 91-113-CIV-T-99B, order at 6 (M.D. Fla. June 1, 1993). Bunkley's jury found that he was armed with a "dangerous weapon" while he committed the burglary. This was proper under the law at the time of Bunkley's trial in 1987 and at the time his conviction became final in 1989.
Bunkley argues that L.B. stated a bright-line rule that a pocketknife with a blade shorter than four inches is a "common pocketknife" excluded from the section 790.001(13) definition of a "weapon," unless other characteristics of the knife, how it is carried, or how it is used establish the weapon-like qualities of the knife. As does the dissent, Bunkley further argues that the L.B. rule existed as a matter of Florida law at the time of his conviction. Bunkley cites several cases to support his argument. See, e.g., Gust v. State, 558 So.2d 450, 452-53 (Fla. 1st DCA 1990) (stating that a key-chain knife would fall within the "common pocketknife" exception to the statutory definition of "weapon"); Arroyo v. State, 564 So.2d 1153, 1154 (Fla. 4th DCA 1990) (reversing a defendant's conviction for attempted armed burglary and holding that a pocketknife is not a "dangerous weapon" with regard to attempted armed burglary unless it was used in a manner likely to cause death or great bodily harm); McCoy v. State, 493 So.2d 1093 (Fla. 4th DCA 1986) (stating that a "small" pocketknife is not a "weapon," but affirming a defendant's conviction because the State presented sufficient evidence for the jury to conclude that the way the defendant used the knife constituted assault with a deadly weapon).
However, these cases do not support Bunkley's or the dissent's position. These cases do not define the scope of the "common pocketknife" exception at the time of Bunkley's conviction with respect to the length of knife blade that qualifies as a "common pocketknife." Further, only McCoy was decided before Bunkley's conviction became final, and McCoy was a Fourth District case. The precedent of the Second District, cited above, was the uncontradicted law in Florida in 1989 and establishes that the question of whether a particular knife was a "common pocketknife" or a "dangerous weapon" was a fact question for the jury. A trial court within the Second District conducted Bunkley's trial. In light of the Second District's precedent, the trial court properly submitted to the jury the question of whether Bunkley's pocketknife was a weapon.
Bunkley also relies on the Attorney General's 1951 opinion to support his argument that his knife was a "common pocketknife" at the time of his conviction. The Florida Attorney General in 1951 opined that "a pocket knife ... with blade approximately *897 four inches long is a `common pocket knife' within the meaning of the [statutory] exception." Op. Att'y Gen. Fla. 51-358 (1951). However, Bunkley's reliance on the Attorney General's opinion as a statement of 1989 law is misplaced because opinions of the Attorney General are not statements of law. See Leadership Housing, Inc. v. Department of Revenue, 336 So.2d 1239, 1241 (Fla. 4th DCA 1976); Beverly v. Division of Beverage of the Dep't of Bus. Regulation, 282 So.2d 657, 660 (Fla. 1st DCA 1973) (holding that opinions of the Attorney General are entitled to great weight in construing state law but are not binding on courts). Further, notwithstanding the Attorney General's statement that a pocketknife with a four-inch blade fits within the statutory "common pocketknife" exception, the Attorney General expressly qualified his opinion by stating that "the concealed carrying of the weapons enumerated in this statute must, to a large extent, be governed by the particular and peculiar facts surrounding each case." Op. Att'y Gen. Fla. 51-358 (1951).
In sum, neither Bunkley nor the dissent cites any law of Florida at the time of Bunkley's conviction to suggest that the court should not have allowed the jury to decide whether Bunkley's particular knife was a dangerous weapon. In Bunkley's case, consistent with the Attorney General's recognition of the factual nature of the issue and as prescribed by applicable Florida law, the trial court properly submitted to the jury the question of whether Bunkley was armed with a "dangerous weapon" or merely carried a "common pocketknife" while he committed a burglary.

CONCLUSION
In answer to the United States Supreme Court's question, we clarify that at the time Bunkley's conviction became final, the question of whether Bunkley's knife fit within the "common pocketknife" exception in section 790.001(13) was a fact question properly answered by a jury instructed on the law. Bunkley was lawfully convicted by the unanimous decision of a jury of his peers properly instructed with the unambiguous law applicable at the time of his offense. He was also sentenced according to that law. Therefore, Bunkley's conviction does not violate the federal due process requirements stated in Fiore.[5]L.B.'s subsequent, conventional change in our decisional law has no retroactive application and thus does not negate Bunkley's lawful conviction.
It is so ordered.
*898 WELLS, LEWIS, and CANTERO, JJ., concur.
WELLS, J., concurs with an opinion, in which CANTERO and BELL, JJ., concur.
ANSTEAD, C.J., dissents with an opinion.
PARIENTE, J., dissents with an opinion, in which ANSTEAD, C.J., concurs.
QUINCE, J., recused.
WELLS, J., concurring.
I fully concur with the majority. I write to explain why the law in respect to Bunkley's case is the law which the district court held it to be when Bunkley's judgment of conviction and sentence became final in 1989. On this remand from the United States Supreme Court, the beginning point of our examination must be the precise statement of the Supreme Court as to our error:
The Florida Supreme Court committed an error of law here by not addressing whether the [L.B. v. State, 700 So.2d 370 (Fla.1997),] decision means that at the time Bunkley was convicted, he was convicted of a crime  armed burglary  for which he may not be guilty.
Bunkley v. Florida, 538 U.S. 835, 123 S.Ct. 2020, 2022 n. *, 155 L.Ed.2d 1046 (2003).
The Supreme Court stated in respect to its decision in Fiore v. White, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001):

Fiore requires that the Florida Supreme Court answer whether in light of L.B., Bunkley's pocketknife of 2 1/2 to 3 inches fits within § 790.001(13)'s "common pocketknife" exception at the time his conviction became final.
Bunkley, 123 S.Ct. at 2023. To answer this direct question of what was the law concerning the common pocketknife exception at the time Bunkley's conviction became "final," this Court must directly confront the issue of whether final decisions of Florida's district courts of appeal are "final" as to the law of Florida or whether there is no extant law of Florida as to the construction of a statute until this Court construes the statute.
The express issues are:
(1) Whether under Florida law a decision by a Florida district court of appeal construing or applying a criminal statute establishes what the law is until a case involving the construction or application of that criminal statute reaches and is decided by this Court; and
(2) Whether, when a case involving the construction or application of a criminal statute reaches and is decided by this Court, the decision of this Court construing or applying the statute relates back to the legislative adoption of the statute and renders void all contrary decisions by Florida's district courts.[6]
I agree with Justice Pariente that this Court's decisions in Bunkley v. State, 833 So.2d 739 (Fla. Nov.21, 2002), and State v. Klayman, 835 So.2d 248 (Fla.2002), issued only a week apart, conflict in respect to these views. I do not agree with Justice Pariente as to how these issues or the conflict between Bunkley and Klayman based upon a proper application of Fiore to Florida law should be resolved. Rather, I conclude that the constitutional structure of Florida's court system and the directly controlling precedent of this Court require the resolution of these two issues to be as follows.

*899 (1) A decision by a Florida district court of appeal establishes the law with respect to the issue addressed in that decision until this Court decides a case contrary to that law.
(2) A decision by this Court that involves the construction or application of a criminal statute and that establishes law contrary to the law established by a Florida district court of appeal changes the law and does not relate back to the adoption of the statute by the Legislature.

FIORE v. WHITE
To answer the Supreme Court's question and to resolve the two pertinent issues set forth above requires an understanding of Fiore.
Fiore was convicted in a Pennsylvania state court of operating a waste management facility without a permit, and his conviction was affirmed through direct appeal in the state court. Fiore's general manager, Scarpone, was convicted of the same offense in a later proceeding in another state court, but his conviction was subsequently reversed by an intermediate appellate court. The Pennsylvania Supreme Court affirmed the reversal, concluding that the state did not make out a crime because Scarpone did have a permit. The permit in question was the same for Fiore as for Scarpone.
Based upon the successful ruling for Scarpone, Fiore sought both direct and collateral relief in the state courts. Fiore was denied relief and thereafter sought federal habeas corpus relief. Fiore argued that Pennsylvania had imprisoned him for conduct which was not criminal under the statutory section charged. The United States District Court granted Fiore's petition. The United States Court of Appeals for the Third Circuit reversed, primarily because it believed that "state courts are under no obligation to apply their decision retroactively." Fiore v. White, 149 F.3d 221, 222 (3d Cir.1998).
In its opinion, the Third Circuit reasoned:
The district court held, and Fiore maintains on appeal, that the Due Process and Equal Protection Clauses of the Fourteenth Amendment require retroactive application of [Commonwealth v. Scarpone, 535 Pa. 273, 634 A.2d 1109 (1993)]. This conclusion, however, is at odds with the Supreme Court's longstanding position that "the federal constitution has no voice upon the subject" of retroactivity. Greater[Great] Northern Ry. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 364[, 53 S.Ct. 145, 77 L.Ed. 360] (1932). See Solem v. Stumes, 465 U.S. 638, 642[, 104 S.Ct. 1338, 79 L.Ed.2d 579] (1984); United States v. Johnson, 457 U.S. 537, 542[, 102 S.Ct. 2579, 73 L.Ed.2d 202] (1982). While the Court has concluded that some federal criminal decisions should apply retroactively, see Davis v. United States, 417 U.S. 333, 346-47[, 94 S.Ct. 2298, 41 L.Ed.2d 109] (1974); United States v. United States Coin & Currency, 401 U.S. 715, 724[, 91 S.Ct. 1041, 28 L.Ed.2d 434] (1971), it has made clear that state courts are under no constitutional obligation to apply their own criminal decisions retroactively. Wainwright v. Stone, 414 U.S. 21, 23-24[, 94 S.Ct. 190, 38 L.Ed.2d 179] (1973). Thus, just as the Supreme Court has fashioned retroactivity rules for the federal courts based on principles of judicial integrity, fairness, and finality, see Teague v. Lane, 489 U.S. 288, 304-310[, 109 S.Ct. 1060, 103 L.Ed.2d 334] (1989), the state courts are free to adopt their own retroactivity rules after independent consideration of these and other relevant principles. *900 As the Supreme Court explained in Sunburst Oil:

A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward.... The alternative is the same whether the subject of the new decision is common law or statute. The choice for any state may be determined by juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts.... [W]e are not at liberty, for anything contained in the constitution of the United States, to thrust upon those courts a different conception of the binding force of precedent or of the meaning of judicial process.
287 U.S. at 364-66[, 53 S.Ct. 145] (emphasis added) (citations omitted).
Consistent with the Supreme Court's admonition that federal courts not require retroactive application of state judicial decisions, this court has refused to require application of new state decisions in habeas proceedings.
Fiore, 149 F.3d at 224-25 (parallel citations omitted).
The United States Supreme Court granted Fiore's petition for certiorari. In setting out the issues in the petition, the Court stated:
Fiore essentially claims that Pennsylvania produced no evidence whatsoever of one element of the crime, namely, that he lacked "a permit." The validity of his federal claim may depend upon whether the interpretation of the Pennsylvania Supreme Court in Scarpone was always the statute's meaning, even at the time of Fiore's trial. Scarpone marked the first time the Pennsylvania Supreme Court had interpreted the statute; previously, Pennsylvania's lower courts had been divided in their interpretation. Fiore's and Scarpone's trial court concluded that § 6018.401(a)'s "permit" requirement prohibited the operation of a hazardous waste facility in a manner that deviates from the permit's terms, and the Superior Court, in adjudicating Fiore's direct appeal, accepted the trial court's interpretation in a summary unpublished memorandum. Then, the Commonwealth Court, in Scarpone's direct appeal, specifically rejected the interpretation adopted by the Superior Court in Fiore's case. And the Pennsylvania Supreme Court in Scarpone set forth its authoritative interpretation of the statute, affirming the Commonwealth Court only after Fiore's conviction became final. For that reason, we must know whether the Pennsylvania Supreme Court's construction of the statute in Scarpone stated the correct understanding of the statute at the time Fiore's conviction became final, or whether it changed the interpretation then applicable. Compare, e.g., Buradus v. General Cement Prods. Co., [356 Pa. 349,] 52 A.2d 205, 208 (1947) (stating that "[i]n general, the construction placed upon a statute by the courts becomes a part of the act, from the very beginning"), with Commonwealth v. Fiore, 665 A.2d at 1193; Commonwealth v. Fiore, CC No. 8508740 (Aug. 18, 1994), at 6 (refusing to apply the Scarpone interpretation because "at the time of [Fiore's] conviction and direct appeals, the interpretation of the law was otherwise").
Fiore v. White, 528 U.S. 23, 28-29, 120 S.Ct. 469, 145 L.Ed.2d 353 (1999) (parallel citations omitted).
The Court then certified the following question to the Pennsylvania Supreme Court:

*901 Does the interpretation of Pa. Stat. Ann., Tit. 35, s. 6018.401(a) (Purdon 1993), set forth in Commonwealth v. Scarpone, [535 Pa. 273,] 634 A.2d 1109, 1112 (1993), state the correct interpretation of the law of Pennsylvania at the date Fiore's conviction became final?
Id. at 29, 120 S.Ct. 469 (parallel citations omitted).
Before the Pennsylvania Supreme Court on the certified question, Fiore took the position that the Pennsylvania Supreme Court did not issue a new rule of law in Scarpone. Fiore claimed that the Pennsylvania Supreme Court had merely provided its first interpretation of an unambiguous statute and that its interpretation was an expression of the law from the date of the enactment of the statute.
The state argued in opposition that the Pennsylvania Supreme Court's decision in Scarpone created a new rule of law. The state argued that any court can create law with its decision. Until a court of greater jurisdiction reverses the decision of a lower court or until a court of equal jurisdiction overrules the decision, the law emanating from the initial decision remains law. The state averred that when Fiore's conviction became final, the 1989 Fiore decision by the Superior Court (an intermediate appellate court) was the controlling law concerning the "permit" requirements.
The Pennsylvania Supreme Court then ruled, based upon Pennsylvania law, that its Scarpone decision did not articulate a new rule of law. The court held that under Pennsylvania law:
There can be no change to statutory law when there has been no amendment by the legislature and no prior decision by this Court. Only the legislature has the authority to promulgate legislation. Our role is to interpret statutes as enacted by the Assembly. We affect legislation when we affirm, alter, or overrule our prior decisions concerning a statute or when we declare it null and void, as unconstitutional. Therefore, when we have not yet answered a specific question about the meaning of a statute, our initial interpretation does not announce a new rule of law. Our first pronouncement on the substance of a statutory provision is purely a clarification of an existing law.
Prior to our opinion in Scarpone, we had not examined Section 6018.401(a) of the SWMA. The only cases involving that statutory provision were the unpublished memorandum opinion from the Superior Court in its review of Fiore's direct appeal and the Commonwealth Court's published decision in Scarpone. As justification for accepting allowance of appeal, we recognized in Scarpone that "[t]he two courts are clearly in conflict and this leaves the Attorney General's office ill-advised on how it should proceed in such situations." Scarpone, 634 A.2d at 1112. Consequently, we were not in a position to overrule a decision by this Court. Certainly, there was no narrowly defined body of law to follow concerning Scarpone's conviction for causing and assisting in the operation of a hazardous waste facility without a permit. Nevertheless, we cannot classify our ruling in Scarpone as one of first impression or without precedent. A case of first impression is one that presents an "entirely novel question of law," which "cannot be governed by any existing precedent." BLACK'S LAW DICTIONARY 635 (6th ed.1990). Our resolution of the conflict presented in Scarpone was governed by familiar rules of statutory interpretation, grounded in existing case law.
Fiore v. White, 562 Pa. 634, 757 A.2d 842, 848 (2000) (footnote omitted).
*902 Upon return to the United States Supreme Court, the Court held:
The Pennsylvania Supreme Court's reply specifies that the interpretation of § 6018.401(a) set out in Scarpone "merely clarified" the statute and was the law of Pennsylvania  as properly interpreted  at the time of Fiore's conviction. Because Scarpone was not new law, this case presents no new issue of retroactivity. Rather, the question is simply whether Pennsylvania can, consistently with the Federal Due Process Clause, convict Fiore for conduct that its criminal statute, as properly interpreted, does not prohibit.
Fiore v. White, 531 U.S. 225, 228, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001).
The essential principle from Fiore is that a determination of what the law is at the time of a defendant's conviction is decided on the basis of state law. This principle holds true with respect to Bunkley's conviction. Therefore, the fundamental analysis in answering the Fiore question with respect to Bunkley has to be whether Florida law is in accord with Pennsylvania law as held by the Pennsylvania Supreme Court that its initial interpretation of a statute does not announce a new rule of law but "is purely clarification of an existing law." Based upon the express constitutional structure of Florida's court system and our precedent interpreting these provisions, the law of Florida is not in accord with Pennsylvania law in this regard.

FLORIDA LAW
To consider this issue under Florida law, it is necessary to initially review the constitutional structure of the Florida court system and the jurisdiction proscribed by the Florida Constitution for the Florida Supreme Court and the Florida district courts of appeal.[7]
Florida's district courts of appeal were established in 1957, following an amendment to Florida's Constitution in 1956. Prior to 1957, jurisdiction for all appeals from courts of general jurisdiction was vested in the Florida Supreme Court. After Florida's new district courts of appeal became operational on July 1, 1957, the Florida Supreme Court emphasized the role of these tribunals as "final" courts.[8] In Ansin v. Thurston, 101 So.2d 808, 810 (Fla.1958), this Court stated:
It was never intended that the district courts of appeal should be intermediate courts. The revision and modernization of the Florida judicial system at the appellate level was prompted by the great volume of cases reaching the Supreme Court and the consequent delay in the administration of justice. The new article embodies throughout its terms the idea of a Supreme Court which functions as a supervisory body in the judicial system for the State, exercising appellate power in certain specified areas essential to the settlement of issues of public importance and the preservation of uniformity of principle and practice, with review by the district courts in most instances being final and absolute.
The intent of the Florida Constitution is to limit the Supreme Court's review of district court decisions to written opinions affecting a class of constitutional or state officers, questions certified by a district court as being of great public importance, *903 or decisions by a district court which are in direct conflict with a decision of another district court or the Florida Supreme Court on the same question of law. See Florida Star v. B.J.F., 530 So.2d 286 (Fla.1988).[9]
Soon after the implementation of the district courts in 1957, this Court in its opinions began to relax the well-defined barriers which constitutionally circumscribed its jurisdiction to review decisions of the district courts. These opinions eroded the finality of district court jurisdiction,[10] causing Justice Thornal, in a dissent in Foley v. Weaver Drugs, Inc., 177 So.2d 221, 234 (Fla.1965), to lament: "If I were a practicing lawyer in Florida, I would never again accept with finality a decision of a District Court." In view of this erosion of finality of the decisions of the district courts, this Court was increasingly overwhelmed with filings.
With the steady rise of petitions for certiorari in this Court, it became obvious to the bench and bar of Florida that some relief was necessary. Thus, in 1978, a commission was appointed which recommended a series of guidelines designed to ensure that this Court acted with more restraint in granting review of district court decisions.[11] Most of those guidelines became an integral part of a revision to article V of Florida's Constitution, which was adopted by voters on March 11, 1980, and became effective on April 1, 1980.
The paramount effect of the 1980 amendment to article V of the Florida Constitution was to again restructure the Supreme Court's appellate jurisdiction so that in most cases the district courts were final appellate courts. Shortly after the adoption of this 1980 amendment, this Court affirmed its understanding that the effect of the amendment was to ensure that the district courts would be "final" courts of appeal.[12] In Jenkins v. State, 385 So.2d 1356, 1359 (Fla.1980), this Court stated:
There can be little doubt that the electorate was informed as to this matter, because opponents of the amendment broadcast from one end of this state to the other that access to the Supreme Court was being "cut off," and that the district courts of appeal would be the only and final courts of appeal in this state. With regard to review by conflict certiorari of per curiam decisions *904 rendered without opinion, they were absolutely correct.
The pertinent language of section 3(b)(3), as amended April 1, 1980, leaves no room for doubt. This Court may only review a decision of a district court of appeal that expressly and directly conflicts with a decision of a district court of another district court of appeal or the Supreme Court on the same question of law.
Article V of the Florida Constitution remains as it was amended in 1980.[13] The restrictions placed on review of district court decisions by the Florida Supreme Court have been the subject of commentary.[14]
*905 In 1980, this Court issued two other decisions which are relevant and important to this analysis. These decisions were: Stanfill v. State, 384 So.2d 141 (Fla.1980), and Witt v. State, 387 So.2d 922 (Fla.1980).
In Stanfill, this Court unequivocally and expressly stated: "The decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court." 384 So.2d at 143. Stanfill was followed in 1992 with Pardo v. State, 596 So.2d 665, 666 (Fla.1992), in which this Court ruled that "in the absence of interdistrict conflict, district court decisions bind all Florida trial courts." Most recently, this Court reiterated this principle in Gore v. Harris, 772 So.2d 1243, 1258 (Fla.), rev'd on other grounds, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), stating that "[t]his Court has determined the decisions of the district courts of appeal represent the law of this State unless and until they are overruled by this Court, and therefore, in the absence of interdistrict conflict, district court decisions bind all Florida trial courts." Thus, a decision of a Florida district court of appeal is the law throughout all of Florida on a particular point of law until there is a different rule by another district court or until this Court renders a different rule.[15] Chief Justice Anstead states in his dissent that I make an "extraordinary assertion that some district court of appeal decisions have binding statewide effect on Florida law." Of course, the assertion I make is not extraordinary but, rather, is based precisely on this Court's precedent. He can choose to disavow the precedent in which he joined, he can choose to ignore it, but the constitutional court structure of Florida and the precedent of this Court are as I have set out. They are real, ordinary, consistent, and directly on point.[16]
Justice Pariente's conclusion that the majority opinion will result in Bunkley "serving out a life sentence for conduct that all times material to his prosecution and conviction did not constitute the crime of armed burglary" is patently incorrect based upon the Florida Constitution and this Court's precedent. Pariente, J., dissenting op. at 81. A decision of this Court does not, under Florida precedent, erase and make disappear the law of Florida announced by the district court in a decision which is final and which is in effect until this Court changes the law. The person convicted of violating the law remains convicted under the law of Florida which was in effect at the time the person *906 was convicted, just as the person would remain convicted after the Legislature changed the law under which the person was convicted subsequent to the person's conviction. See Magaw v. State, 537 So.2d 564 (Fla.1989); Moore v. State, 748 So.2d 1094 (Fla. 3d DCA 2000). For more than a century, the law of Florida has been that "[r]epeal or amendment of a criminal statute shall not affect prosecution or punishment for any crime previously committed." Art. X, § 9, Fla. Const.
In Witt, this Court issued what has become the Florida hallmark decision on the application of later decisional law to petitions for postconviction relief under Florida Rule of Criminal Procedure 3.850. As Fiore argued before the Third Circuit in Fiore v. White, 149 F.3d at 225-26, Witt contended that Davis v. United States, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), entitled him to retroactive application of decisions of this Court to his postconviction motion. This Court declined to follow Davis, stating:
We start by noting that we are not obligated to construe our rule concerning post-conviction relief in the same manner as its federal counterpart, at least where fundamental federal constitutional rights are not involved. First, the concept of federalism clearly dictates that we retain the authority to determine which "changes of law" will be cognizable under this state's post-conviction relief machinery. Second, we know of no constitutional requirement that the scope of Rule 3.850 be fully congruent with that of the analogous federal statute. A limited role for the rule in no way abridges the federal due process right to be heard, since state prisoners will still be free to seek collateral relief in the federal courts under that system's seemingly more relaxed standards. In fact, several commentators have argued forcefully that state courts should narrow their grounds for collateral relief because of the duality of review, and at least one state has limited post-conviction relief narrowly to constitutional claims.
Not being required to accord Davis breadth to post-conviction proceedings under our rule, we decline to do so. To allow nonconstitutional claims as bases for post-conviction relief is to permit a dual system of trial and appeal, the first being tentative and nonconclusive. Our justice system could not accommodate such an expansion; our citizens would never tolerate the deleterious consequences for criminal punishment, deterrence and rehabilitation. We reject, therefore, in the context of an alleged change of law, the use of post-conviction relief proceedings to correct individual miscarriages of justice or to permit roving judicial error corrections, in the absence of fundamental and constitutional law changes which cast serious doubt on the veracity or integrity of the original trial proceeding.
Witt, 387 So.2d at 928-29 (footnotes omitted).
This Court went on to state what changes in the law would be applicable under rule 3.850.
We emphasize at this point that only major constitutional changes of law will be cognizable in capital cases under Rule 3.850. Although specific determinations regarding the significance of various legal developments must be made on a case-by-case basis, history shows that most major constitutional changes are likely to fall within two broad categories. The first are those changes of law which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties. This category is exemplified by Coker v. Georgia, 433 *907 U.S. 584[, 97 S.Ct. 2861, 53 L.Ed.2d 982] (1977), which held that the imposition of the death penalty for the crime of rape of an adult woman is forbidden by the eighth amendment as cruel and unusual punishment. The second are those changes of law which are of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall and Linkletter. Gideon v. Wainwright, of course, is the prime example of a law change included in this category.[n.]
[n.] Compare Gideon with Linkletter v. Walker, 381 U.S. 618[, 85 S.Ct. 1731, 14 L.Ed.2d 601] (1965), wherein the Supreme Court refused to give retroactive application to the newly-announced exclusionary rule of Mapp v. Ohio, 367 U.S. 643[, 81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961).
In contrast to these jurisprudential upheavals are evolutionary refinements in the criminal law, affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters. Emergent rights in these categories, or the retraction of former rights of this genre, do not compel an abridgement of the finality of judgments. To allow them that impact would, we are convinced, destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit.
Incidental to the notion of what constitutes a law change for post-conviction relief purposes is the problem of what courts bring about such changes. Even within the narrow area of major constitutional law changes, there must be some restriction on the number of tribunals which can adopt law changes sufficient to warrant relief in post-conviction proceedings. The reason is obvious. In Florida alone there are 500 trial court judges, 39 district court judges sitting in panels of three on five appellate courts, and the Supreme Court. Little finality would attend criminal convictions if each of these tribunals was an eligible source of law change. Similar considerations apply to the host of federal and other non-Florida judges from whom new "law" might emerge. Consequently, we hold that only this Court and the United States Supreme Court can adopt a change of law sufficient to precipitate a post-conviction challenge to a final conviction and sentence.
Witt, 387 So.2d at 929-30 (footnotes omitted).
Following Witt, in 1987, this Court began releasing a series of decisions which dealt with the precise issue decided by the Pennsylvania Supreme Court in its response to the United States Supreme Court.[17] In Bass v. State, 12 Fla. L. Weekly 289 (Fla. June 11, 1987), withdrawn, 530 So.2d 282 (Fla.1988), this Court rendered an initial opinion as to whether this Court's decision in Palmer v. State, 438 So.2d 1 (Fla.1983), in which this Court had construed section 775.087, Florida Statutes, was applicable to Bass. Bass had previously been sentenced under a different construction of section 775.087, which had been affirmed by the district court of appeal prior to this Court's decision in Palmer. Bass thereafter sought postconviction relief in accordance with *908 Palmer. In language directly on point to the issue now before this Court, the majority in Bass stated:
The principle issue before this Court is whether the Palmer decision constitutes a change in the substantive law of sentencing or does it merely interpret pre-existing statutory law. In Palmer, this Court considered the scope of the trial court's discretion to impose consecutive sentences under section 775.087, Florida Statutes (1981). The Court held that the legislature did not intend, by enacting that statute, to allow the "stacking" of consecutive mandatory minimum sentences arising out of the single criminal episode. The Court reasoned that the discretion to do so statutorily belonged to the Parole and Probation Commission because such sentence stacking directly affected parole computations.

Palmer does not represent a substantive change in the law. Rather, in Palmer, this Court merely interpreted statutory provisions and corrected errors in the imposition of a statute which existed prior to our decision in Palmer. That opinion did not announce any new changes in the law itself. It simply examined the statute and corrected mistakes in its implementation.
Because we believe that Palmer does not represent any change in law, we need not examine the issue of whether violation of that decision is fundamental error. Nor do we here consider whether Palmer should retroactively apply. Our determination that Palmer did not change the law of sentencing in any substantive way necessarily precludes examination of those issues.
Bass, 12 Fla. L. Weekly at 289.
In a dissent which was prescient as to the critical response the majority opinion received, as well as to the present analysis, Justice Ehrlich spotted the problem with the majority's analysis and wrote in dissent:
In order to reach a result it believes to be mandated by fairness and uniformity, the majority opinion turns our decision in Witt v. State, 387 So.2d 922 (Fla.), cert. denied, 449 U.S. 1067[, 101 S.Ct. 796, 66 L.Ed.2d 612] (1980), on its head. Because the majority's reasoning is both illogical and contrary to the proper understanding of this Court's relationship to the district courts, and because the result reached undermines society's need for finality powerfully explicated in Witt, I dissent.
The majority attributes controlling significance to the fact that Palmer did not "change" the law, but merely interpreted pre-existing statutory law. I respectfully suggest that this statement cannot withstand analysis.
The district courts of appeal are, in most instances, courts of last resort, Johns v. Wainwright, 253 So.2d 873 (Fla.1971), and the "decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court." Stanfill v. State, 384 So.2d 141, 143 (Fla.1980).
The decision of the First District Court of Appeal in Palmer is not a case of first impression, see Davis v. State, 392 So.2d 947 (Fla. 3d DCA 1980) (approving consecutive mandatory minimum three year sentences for robbery and kidnapping in spite of the defendant's claim that both offenses arose from the same episode). Therefore, the district courts' decisions in Palmer and Davis were the law in this state until this Court changed the law and interpreted the statute at issue contrary to the district courts' interpretation.
Under the majority's reasoning, however, we did not "change" the law! The *909 fact that we took a contrary view of the statute at issue in Palmer than did the district courts clearly evidences that we did change the law in Florida on this issue. Taken to its logical conclusion, therefore, the majority holds that until this Court decides any issue, there is no extant law.
This simple observation totally erodes the majority's major premise that Palmer did not change the law. Of course it did. Under the district courts' view, a trial judge could impose consecutive mandatory minimum three year sentences pursuant to section 775.087(2), for each separate crime committed during a single criminal episode. Palmer v. State, 416 So.2d 878, 881 (Fla. 1st[4th] DCA 1982). This Court, however, found that the statute did not authorize denying eligibility for parole consideration for any more than three years when the offenses occurred during a single criminal episode. Palmer v. State, 438 So.2d 1, 3 (Fla.1983).
The fact that this Court changed the law did not render the sentences imposed before our decision illegal. Those defendants whose appeals were not yet complete at the time our decision in Palmer was issued were entitled to its benefit. See, e.g., State v. Safford, 484 So.2d 1244, 1245 (Fla.1986) (interpreting our holding in State v. Neil, 457 So.2d 481 (Fla.1984), that it would not be retroactively applied, meant that Neil would not apply to those cases where trial and appellate process were complete when Neil became effective). Those who were sentenced prior to our decision in Palmer stood in the same position before the appellate court as did Mr. Palmer; they could have raised the identical issue. As the district court below correctly found, Florida Rule of Criminal Procedure 3.850 is not to be utilized to litigate claims which could have or should have been raised on direct appeal. See, e.g., Copeland v. Wainwright, 505 So.2d 425 (Fla.1987).
All that Bass is asking this Court to do now is retroactively apply Palmer. Whether a change in the law should be given retroactive application, i.e., after a conviction and sentence have been affirmed on appeal, is controlled by our decision in Witt. Witt was a death sentenced prisoner who sought 3.850 relief based on changes in the law subsequent to his conviction and sentences being affirmed by this Court. In denying relief, we held that only changes of a fundamental and constitutional nature emanating from this Court or the United States Supreme Court were cognizable grounds for collateral relief. 387 So.2d at 931. We adopted this apparently stringent requirement because of society's need for finality of judgments. In contrast to these "jurisprudential upheavals" we recognized that "evolutionary refinements in the criminal law" would not be retroactively applied, id. at 929, because, as Justice England cogently explained, "there would never be a time when a defendant facing execution could not identify a law change sufficient to initiate a collateral attack on his sentence and conviction." Id. at 931 (England, J., concurring). Justice England went on to point out as an example that two similarly situated defendants, Sawyer and Brown, received very different sentences because of our intervening decision in Tedder v. State, 322 So.2d 908 (Fla.1975). Id. at 932. The majority, in essence, thumbs its nose at the teachings of Witt, in order to achieve what it perceives to be a desirable result, without reflecting on its precedential erosion of Witt.

Is the majority herein prepared to abrogate the need for finality underlying *910 our decision in Witt? Because our decision in Palmer was simply an evolutionary refinement in the criminal law, and not a change of fundamental and constitutional dimensions, it should not be retroactively applied. After today's decision, the Court should fully expect a flood of new 3.850 claims whenever this Court's "interpretation of pre-existing statutory law" conflicts with the law in effect both at the time the defendant was sentenced and his sentence was affirmed on appeal.
Bass, 12 Fla. L. Weekly at 289-290 (Ehrlich, J., dissenting) (footnotes omitted).
Importantly, within two months of the issuance of this Court's opinion in Bass, the First District Court of Appeal issued its decision in Hall v. State, 511 So.2d 1038 (Fla. 1st DCA 1987) quashed, 534 So.2d 1144 (Fla.1988). In that case, Judge Zehmer, writing for the court, stated:
We read the Bass opinion to mean that when the supreme court construes an existing statute governing the length of sentences that may be lawfully imposed and reaches a construction of the statute that is contrary to a construction theretofore announced in a district court of appeal decision, the supreme court's decision is not a change in the law but merely announces what the statutory law always has been. Thus, where the changed construction reveals that a sentence, apparently legal when imposed, is illegal under the new construction, such sentence may be collaterally attacked under rule 3.850. In effect, a lower appellate court decision construing a statute defining the sentence that can be lawfully imposed does not establish what the statute actually means and, in this sense, what the law actually is, but only what the law may be until actually approved or overruled by the supreme court. Once interpreted by the supreme court, the statute must be given that meaning from its inception, not only in cases currently on appeal, but also in those cases which have already become final after appeal to the district courts.
We have experienced some difficulty discerning the precise effect of the holding in Bass on the issue before us. The decision appears to be based exclusively on the legal principle that the court's construction of a statute gives it meaning from the inception of the statute (unless otherwise specified in the decision) to the complete exclusion of the legal doctrines of law of the case and the correlative concept of finality of decisions. Ordinarily, a decision which has become final based upon a certain construction of a statute may not thereafter be reopened and readjudicated because of a changed construction of that statute. Bass holds, however, that a different rule applies in respect to criminal sentences because of the explicit language in rule 3.850 which permits appellate review of a sentence that exceeds the limits provided by the sentencing guidelines law at any time.
Why, then, does Bass seem to accord different treatment and effect to changes in sentencing laws than does Witt? Although the majority opinion in Bass made no reference to Witt and did not explicitly distinguish it, we note that the change of law arguments in Witt were predicated on decisions of the Florida Supreme Court which allegedly changed rules announced in prior opinions regarding application of the death sentence, and that Witt did not involve a direct construction of applicable statutory language specifying the length of the sentence that could lawfully be imposed. The Palmer decision, on the other hand, construed on direct appeal, for the first time by the supreme court, the meaning of the language in section 775.087 regarding *911 the circumstances under which the minimum mandatory sentences therein specified could be imposed, and reached a result contrary to the construction of that statute by a lower appellate court. Perhaps, therefore, the material distinction between Bass and Witt lies in the fact that Palmer overruled a lower court construction of a statute bearing on the permissible length of sentence that could be imposed. Because we find no other basis for distinguishing these cases, we believe Bass  not Witt  to be the controlling precedent on the issue before us. In this case, as in Bass, the supreme court overruled a lower court construction of a statute, with the result that the length of a sentence that could be lawfully imposed was changed.
Hall, 511 So.2d at 1041-42 (footnotes omitted).
The district court then granted Hall relief but certified the following question to this Court:
We recognize that this decision will have the effect, unless quashed by the supreme court, of authorizing convicted persons presently serving a sentence exceeding the recommended guidelines range based on habitual-offender status to collaterally attack the legality of their sentence in rule 3.850 motions. Because this consequence makes the issue here decided one of great public importance, we certify to the supreme court the following question:
IS APPELLANT PERMITTED TO COLLATERALLY ATTACK THE LEGALITY OF HIS GUIDELINES DEPARTURE SENTENCE BY RULE 3.850 MOTION FOR POST-CONVICTION RELIEF ON THE BASIS THAT THE SOLE REASON FOR DEPARTURE, HIS STATUS AS A HABITUAL OFFENDER, ALTHOUGH VALID UNDER A LOWER APPELLATE COURT DECISION AT THE TIME IMPOSED, IS INVALID UNDER A SUBSEQUENTLY ISSUED SUPREME COURT DECISION ENUNCIATING A DIFFERENT CONSTRUCTION OF THE SENTENCING STATUTES AND SENTENCING GUIDELINES RULE?
Id. at 1044.
Following the First District's decision in Hall, this Court withdrew on rehearing its 1987 decision in Bass v. State, 530 So.2d 282 (Fla.1988). Bass was granted postconviction relief, but this Court simply stated that "as a matter of policy," its Palmer decision should be applied retroactively. The reason then stated for granting such relief was so that Bass would not be treated differently from those sentenced after Palmer.
Thereafter, on November 17, 1988, this Court issued an opinion which responded to the First District's concern expressed in Hall. In McCuiston v. State, 534 So.2d 1144 (Fla.1989), this Court stated:
Subsequent to the rendition of all of the foregoing opinions, a further development took place which substantially affects the outcome of our decision. On September 1, 1988, this Court, on rehearing, withdrew its opinion in Bass and substituted a new opinion in lieu thereof. We maintained our position that Bass was entitled to relief but did so only on the basis that Palmer should be deemed to have retroactive application. That portion of our original opinion placing in doubt lower appellate court constructions of sentencing statutes until approved or overruled by the Supreme Court which puzzled the First District Court of Appeal in Hall is not contained in our new opinion. Therefore, the determination of whether *912 Whitehead [v. State, 498 So.2d 863 (Fla.1986)] has retroactive application should be decided upon traditional principles pertaining to changes in decisional law.
In Witt v. State, 387 So.2d 922 (Fla.), cert. denied, 449 U.S. 1067 [, 101 S.Ct. 796, 66 L.Ed.2d 612] (1980), this Court held that to be cognizable under a motion for postconviction relief, a change in decisional law must be a fundamental and constitutional change. We observed that most major constitutional changes in the law are either (1) those which place beyond the authority of the state the power to regulate certain conduct or to impose certain penalties, or (2) those changes which meet the three-prong test for retroactivity set forth in Stovall v. Denno, 388 U.S. 293, 297[, 87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967). We then stated:
In contrast to these jurisprudential upheavals are evolutionary refinements in the criminal law, affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters. Emergent rights in these categories, or the retraction of former rights of this genre, do not compel an abridgement of the finality of judgments. To allow them that impact would, we are convinced, destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit.
387 So.2d at 929-30 (footnote omitted). McCuiston, 534 So.2d at 1146 (footnote omitted).
Based upon Witt, McCuiston was held not to be entitled to postconviction relief. Also on November 17, 1988, this Court issued its decision quashing the First District's decision granting relief to Hall. This Court answered in the negative the question which must be answered here, which is whether a defendant can collaterally attack in postconviction the construction of a criminal statute which, although valid under a decision of a district court at the time the defendant's conviction became "final," is an invalid construction under a subsequently issued Florida Supreme Court decision enunciating a different construction of the statute. State v. Hall, 534 So.2d 1144 (Fla.1989).
Finally, in Florida Star v. B.J.F., 530 So.2d 286 (Fla.1988), an issue was presented as to the exhaustion of state remedies for the purpose of calculating the time for seeking review of a district court decision in the United States Supreme Court. In arguing for dismissal before the United States Supreme Court, the appellee argued that the Florida Supreme Court lacked jurisdiction to review the case and that the opinion of the First District was therefore the final decision of the highest state court empowered to hear the cause. Under this argument, The Florida Star should have appealed to the United States Supreme Court within ninety days of the First District's opinion. Instead, The Florida Star filed a petition in the Florida Supreme Court seeking review of the district court's written opinion, and this Court had not ruled upon that petition before the expiration of ninety days from the district court's rendering of its decision. The United States Supreme Court certified to this Court the following question:
WHETHER THE FLORIDA SUPREME COURT HAD JURISDICTION PURSUANT TO ARTICLE V, SECTION 3(b)(3) OF THE FLORIDA CONSTITUTION OR OTHERWISE TO HEAR APPELLANT'S APPEAL IN THIS CAUSE FROM THE FLORIDA *913 FIRST DISTRICT COURT OF APPEAL.
Florida Star v. B.J.F., 484 U.S. 984, 984, 108 S.Ct. 499, 98 L.Ed.2d 498 (1987). This Court answered this question by stating:
[W]e limit our answer to the context in which the question was posed. For that sole purpose, we answer the question in the affirmative. This Court in the broadest sense has subject-matter jurisdiction under article V, section 3(b)(3) of the Florida Constitution, over any decision of a district court that expressly addresses a question of law within the four corners of the opinion itself. That is, the opinion must contain a statement or citation effectively establishing a point of law upon which the decision rests. The opinion in B.J.F. unquestionably met this requirement.
We premise our holding on our conclusion that article V, section 3(b)(3) creates and defines two separate concepts. The first is a general grant of discretionary subject-matter jurisdiction, and the second is a constitutional command as to how the discretion itself may be exercised. In effect, the second is a limiting principle dictated to this Court by the people of Florida. While our subject-matter jurisdiction in conflict cases necessarily is very broad, our discretion to exercise it is more narrowly circumscribed by what the people have commanded:

(b) JURISDICTION.  The supreme court:
....
(3) May review any decision of a district court of appeal... that expressly and directly conflicts with a decision of another district court of appeal or of the supreme court on the same question of law.
Art. V, § 3(b)(3), Fla. Const.
Thus, it is not necessary that conflict actually exist for this Court to possess subject-matter jurisdiction, only that there be some statement or citation in the opinion that hypothetically could create conflict if there were another opinion reaching a contrary result. This is the only reasonable interpretation of this constitutional provision. As the final authority on the meaning of the Florida Constitution, see Art. IV, § 1(c), and Art. V, § 3(b)(1), (3), Fla. Const., this Court has the final and inherent power to determine what constitutes express and direct conflict....
....
... While this Court has subject-matter jurisdiction to hear any petition arising from an opinion that establishes a point of law, we have operated within the intent of the constitution's framers, as we perceive it, in refusing to exercise our discretion where the opinion below establishes no point of law contrary to a decision of this Court or another district court.

Florida Star, 530 So.2d at 288-89 (emphasis added) (footnote omitted).
In respect to the restriction on the Florida Supreme Court that the Court cannot review decisions of the district courts on their merits unless one of the constitutional criteria is within the four corners of the district court's opinion, the lack of discretion and lack of jurisdiction equate to the same thing: the case will not be heard by the Florida Supreme Court.[18]
Therefore, this Court's express precedent answers the direct question posed by the United States Supreme Court to the Pennsylvania Supreme Court in Fiore directly opposite to the answer given by the Pennsylvania Supreme Court.

*914 BUNKLEY-KLAYMAN DECISIONS
While Bunkley and Klayman involved two different statutes, the issues in these cases were the same  whether the constructions of the statutes at the time Bunkley and Klayman's convictions became final[19] were made nonfinal by this Court's subsequently acquiring jurisdiction over the cases and construing the statutes upon which their convictions were based contrary to the earlier constructions applied in their cases. This Court acquired jurisdiction in both of these cases via certified questions by the district courts of appeal, inquiring whether this Court's decisions that construed the statutes contrary to the district court precedent after their convictions were final should be retroactively applied. See Bunkley v. State, 768 So.2d 510 (Fla. 2d DCA 2000), approved, 833 So.2d 739 (Fla.2002), vacated, 538 U.S. 835, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003); Klayman v. State, 765 So.2d 784 (Fla. 4th DCA 2000), approved, 835 So.2d 248 (Fla.2002).
As indicated at the outset of this opinion, the decisions of this Court in Bunkley and Klayman were released within a week of each other. Klayman was released on November 14, 2002, and Bunkley was released on November 21, 2002. Regrettably, neither of the majority opinions in Klayman and Bunkley mentions or explains this Court's precedent on the precise issue framed by the United States Supreme Court in Fiore. The majority simply does not acknowledge Bass, Hall, or McCuiston.[20] The majority opinion in Bunkley similarly does not acknowledge Klayman, which was released after Bunkley.[21] This was error because, as seen in the portions of Bass, Hall, and McCuiston that I have extensively quoted, the issue of what the law was at a time when a Florida district court had ruled one way, but which was subsequently ruled in a contrary way by the Florida Supreme Court was clearly answered by this Court in Bass, Hall, and McCuiston.[22]
Rather than squarely confront this issue or this precedent, the majority opinions in both cases resorted to defining the word "clarification." Neither the analysis nor the definition of "clarification" created by the majority opinions had any basis in our precedent. By use of this definition, the majority in Klayman held that Fiore required relief from a final district court of appeal decision, whereas the majority in Bunkley held that Fiore did not apply and that there was no relief from a final district court of appeal decision. This definition of "clarification" led to the flawed conflict in decisions.
The key comparative passages which resulted in the majority opinions not confronting the fundamental issues are as follows. In Klayman, this Court stated:
In an effort to determine whether Hayes should be applied retroactively, *915 we must ask, is Hayes a "clarification" or "change" in the law? A clarification is a decision of this Court that says what the law has been since the time of enactment. To determine whether a decision clarifies a statute, we first look to the decision itself to discern its intent. If the decision is silent or ambiguous on this point, we then look to the underlying statute to discern its intent. Where the Legislature cedes no discretion to the courts either directly[n.1] or indirectly[n.2] but instead employs definitive language that ordinarily requires no judicial construction, the Legislature intends that the statute be applied as enacted. A decision by this Court confirming the original intent is a clarification of extant law.
[n.1] For example, the Legislature directly ceded to the courts the authority to formulate grounds for departing from the sentencing guidelines. See § 921.001(6), Fla. Stat. (2001) ("A court may impose a departure sentence outside the sentencing guidelines based upon circumstances or factors which reasonably justify which reasonably justify the aggravation or mitigation of the sentence....").
[n.2] The Legislature may indirectly cede discretion to the courts by employing language that commonly requires judicial construction. Examples of such language include "careful and prudent," "reasonable," and "probable cause." See, e.g., § 316.1925, Fla. Stat. (2001) ("Any person operating a vehicle upon the streets or highways within the state shall drive the same in a careful and prudent manner....") (emphasis added); § 856.015(2), Fla. Stat. (2001) ("No adult having control of any residence shall allow an open house party to take place at said residence if any alcoholic beverage or drug is possessed or consumed ... by a minor ... and where the adult fails to take reasonable steps to prevent the possession or consumption of the alcoholic beverage or drug.") (emphasis added); § 933.04, Fla. Stat. (2001) ("[N]o search warrant shall be issued except upon probable cause....") (emphasis added).

Hayes is such a clarification, because the Legislature, in formulating the trafficking statute, ceded no discretion to the courts either directly or indirectly with regard to the types and quantities of substances proscribed by the statute.
Klayman, 835 So.2d at 253.
In Bunkley, this Court stated:
As a rule, a change in the statutory law is presumed to operate prospectively absent a clear showing of contrary intent. A change in the decisional law in a nonfinal case, on the other hand, is presumed to operate in all other nonfinal cases. A change in either the statutory or decisional law may operate retroactively when retroactive application is expressly provided, but regardless of intent, the issue of retroactivity is ultimately controlled by overarching constitutional principles.
The Court in Witt v. State, 387 So.2d 922 (Fla.1980), was confronted with the following question: must a change in the law that is announced in a nonfinal case be applied in final cases? The Court held that only "jurisprudential upheavals" will be applied in final cases and that "evolutionary refinements" in the law will not be applied in final cases....
In brief, changes in the decisional law are divided into two subgroups for retroactivity purposes. A "jurisprudential upheaval" is a major constitutional change of law, announced by either this *916 Court or the United States Supreme Court, that addresses a basic unfairness in the system. The unfairness must be so fundamental that it undermines confidence in the validity of final cases and outweighs the doctrine of finality. An "evolutionary refinement," on the other hand, is a conventional change that affords new or different guidelines for Florida courts in exercising their authority in applying the law. Jurisprudential upheavals are applied retroactively. We add that, as opposed to "changes" in the law, an entirely separate body of precedent, i.e., "clarification" in the law, has no application under Florida law in the context of retroactivity.
V. THE PRESENT CASE
In analyzing the retroactivity of L.B. under Witt, we are called upon to determine whether L.B. was a "jurisprudential upheaval" or an "evolutionary refinement" in the law. As noted above, a jurisprudential upheaval is a "major constitutional change of law." Examples include Gideon v. Wainwright, 372 U.S. 335[, 83 S.Ct. 792, 9 L.Ed.2d 799] (1963), and Coker v. Georgia, 433 U.S. 584[, 97 S.Ct. 2861, 53 L.Ed.2d 982] (1977). L.B. clearly was not a decision of that order, for L.B. was a routine statutory construction case wherein this Court construed the phrase "common pocketknife."
Rather L.B. was an "evolutionary refinement" in the law, i.e., it was a conventional change that "affords new or different guidelines" for the courts in applying the law. To determine whether a decision refines a statute, we first look to the decision itself to discern its intent. If the decision is silent or ambiguous on this point, we then look to the statute to discern its intent. Where the Legislature cedes a measure of discretion to the courts either directly or by employing language that commonly requires judicial construction, the Legislature intends for the courts to effectuate the purpose of the statute by "refining" the decisional law in the face of "evolving circumstances."
The Legislature, at the turn of the century, ceded discretion to the courts by employing the phrases "dangerous weapon" and "common pocketknife" in the burglary and weapon statutes, and these phrases clearly required judicial construction in order to provide a meaningful basis for imposing sanctions. This Court's decision in L.B., which was issued in 1997, was the culmination of a century-long evolutionary process. Although some courts during that period may have interpreted "common pocketknife" contrary to the holding in L.B., each court nevertheless sought to comply with legislative intent and to rule in harmony with the law as it was interpreted at that point in time. A key consideration is that none of the courts attempted to impose criminal sanctions without statutory authority  i.e., none ruled in contravention of legislative intent. Thus, none of the convictions imposed pursuant to section 790.001(13) violated the Due Process Clause in this regard.
Bunkley, 833 So.2d at 743-46 (footnotes omitted).
The analysis in the above passages from the majority opinions which ties "clarification" or "evolutionary refinement" to the Legislature "ceding or not ceding discretion to the courts" to construe the criminal statutes involved is analysis which has no basis in our law, which resulted in our decisions in Bunkley and Klayman being in conflict, and which resulted in our decisions not directly answering the question *917 which the United States Supreme Court has remanded to us to answer in Bunkley. The question now before us is what Florida law was at the time Bunkley's convictions became final. The answer to this question has nothing to do with what power the Legislature "ceded" to this Court to construe criminal statutes. The question must instead be answered based upon the Florida Constitution and our precedent.

THE ANSWER
As the foregoing review illustrates, since 1957 the Florida constitutional structure for Florida's judicial system has been for decisions of the district courts of appeal to be "final" decisions. Though in various instances opinions from this Court have seemed to erode this constitutional structure, our precedent has always come back to what this Court recognized in 1958 in Ansin that decisions of the district courts are final.
The necessity for district court decisions to be recognized as the final law until reversed on their merits in this Court structure stems from the limited jurisdiction of the Florida Supreme Court. As has been set forth, this Court only has the power of review in expressly delineated instances. This Court has no power to "reach down" and assume jurisdiction in a case to correct what this Court perceives as error, even if the issue appears to this Court to be important or involves the construction of a statute.[23]
Under this court structure, a decision of a district court construing a statute can remain in effect indefinitely,[24] and if there is no conflict with another district court opinion and no certification of an issue by a district court, a United States Circuit Court of Appeals, or the United States Supreme Court, then this Court has no jurisdiction to review the district court decision.[25] The district court decision would have to be followed by trial courts in all sixty-seven of Florida's counties. Pardo v. State, 596 So.2d 665 (Fla.1992).
To hold that such a district court decision is subject to being void ab initio creates chaos in the Florida court system because all trial court decisions throughout Florida which were required to follow the district court decision would thus become void.[26] Such a decision would likewise wreak havoc on the sentencing structure of the judicial system in the context of this case in that if district court decisions are not considered final, all sentences that are dependent upon a conviction being final would become unraveled. It is simply incorrect under Florida's court structure to conclude that a decision from this Court on a point of law that is contrary to a district court decision does not change that law. Since the district courts of appeal were created, Florida's judicial system has depended upon the principle that the decisions of the district courts are final as is required for the stable operation of justice. Justice Ehrlich was without a doubt correct in the original Bass decision. It was because Justice Ehrlich was correct that this Court granted rehearing in Bass and answered the certified question in Hall in the negative.

CONCLUSION
The answer to the direct question sent to us by the United States Supreme Court *918 is that the law in Bunkley's case at the time of his conviction was as decided by the Second District Court of Appeal in Bunkley's direct appeal. The majority correctly states the law of Florida that applied in Bunkley's case in 1989. The construction of the statute under which Bunkley was convicted, which was set forth in L.B., was a change in the law to the extent that it differed from the prior construction of the statute in final decisions of the district courts and should have no effect on Bunkley's final judgment of conviction and sentence.
CANTERO and BELL, JJ., concur.
ANSTEAD, C.J., dissenting.
I fully concur in Justice Pariente's dissenting opinion and write separately only to comment on the extraordinary assertion in Justice Wells' separate opinion that some District Court of Appeal decisions have binding statewide effect on Florida law.
The jurisdiction of Florida's courts are strictly circumscribed by the provisions of Article V of Florida's Constitution. Those provisions strictly limit the legal effect of any district court decision to the geographic bounds of that court. Hence, under Florida's Constitution a decision of a district court binds all of the circuit and county courts in that geographic district.
This Court's jurisdiction and authority are also strictly proscribed by the provisions of Article V. In fact, this Court's jurisdiction is perhaps the most limited of any state high court in the nation. Unlike the U.S. Supreme Court and other state high courts, this Court does not have the broad, discretionary review authority that comes with the power of review through the writ of certiorari. This Court has no jurisdiction beyond that explicitly provided for in Florida's Constitution, and Article V does not grant us the authority to expand the jurisdiction of a district court beyond its territorial bounds as provided in the Constitution. Hence, we have no constitutional authority to direct that district court decisions will be binding throughout the State of Florida. In fact, of course, that is our role, and our role alone.
Of course, we may have some supervisory authority over Florida's appellate and trial courts. In fact, that supervisory authority is largely vested in the Chief Justice of the Supreme Court. Under that authority it may be possible, for purposes of the orderly administration of the justice system, for us to direct trial courts to follow a decision of another district court where there is no decision on point in their district. But any such directive would be solely for administrative convenience, and would be a far cry from establishing as a matter of constitutional law that a decision of a single district court becomes the binding law in all of Florida.
Accordingly, I respectfully disagree with my colleague's constitutional analysis, which attempts to expand the jurisdiction and authority of the district courts.
PARIENTE, J., dissenting.
I respectfully dissent. The facts on which the Second District and this Court previously decided this case are as follows:
Bunkley broke into a closed, unoccupied Western Sizzlin' Restaurant in the early morning hours, and was apprehended after leaving the structure with a common pocketknife in his pocket. At the time of Bunkley's arrest, the pocketknife, with a blade of 2 1/2 to 3 inches in length, was folded and in his pocket. There is no evidence indicating Bunkley ever used the pocketknife during the burglary, nor that he threatened anyone with the pocketknife at any time.
*919 Bunkley v. State, 833 So.2d 739, 741 (Fla.2002) (Bunkley I) (quoting Bunkley v. State, 768 So.2d 510, 510 (Fla. 2d DCA 2000)). The United States Supreme Court relied on these same facts when it vacated our decision and remanded the case to us to clarify our decision. See Bunkley v. Florida, 538 U.S. 835, 123 S.Ct. 2020, 2024, 155 L.Ed.2d 1046 (2003) (Bunkley II). The task set for us by the Supreme Court turned on these facts and no others:
On remand, the Florida Supreme Court should consider whether, in light of the L.B. decision, Bunkley's pocketknife of 2 1/2 to 3 inches fit within § 790.001(13)'s "common pocketknife" exception at the time his conviction became final.
Id. at 2024 (emphasis supplied).
The correct answer to the United States Supreme Court's question whether Bunkley's pocketknife fit within the "common pocketknife exception" when his conviction became final is yes. The applicable statutory law regarding this exception, as properly interpreted in L.B. v. State, 700 So.2d 370 (Fla.1997), remained unchanged for over a century.[27] In Fiore v. White, 531 U.S. 225, 228, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), the United States Supreme Court held that due process is violated when a state convicts and incarcerates an individual for conduct that the state's "criminal statute, as properly interpreted, does not prohibit." In this case, because the law as properly interpreted subsequent to his conviction did not prohibit Bunkley from carrying the pocketknife, Bunkley should not remain incarcerated for the crime of armed burglary. The principles of due process enunciated in Fiore require that Bunkley receive the benefit of the Court's clarification of the law in L.B.
Fiore applies only if two stringent conditions are met: (1) the pronouncement by this Court is a first-time clarification of a criminal statute and (2) the statute as properly interpreted does not prohibit the conduct for which the defendant has been convicted. Simply put, the defendant is not guilty of the crime for which he has been previously convicted under the correct legal interpretation of the criminal statute provided by the state's highest court. The due process concern for fundamental fairness requires that a conviction be set aside when the person convicted is in fact not guilty of the offense.
Because Fiore is narrow, I disagree with Justice Wells that applying its holding to cases such as Bunkley's will create "havoc" or "chaos" by undermining the finality of district court decisions.[28] We allow challenges to illegal sentences to be made "at any time" under Florida Rule of Criminal Procedure 3.800(a), even when the result overturns a district court decision. See, e.g., Valenzuela v. State, 803 So.2d 706 (Fla.2001) (quashing district court affirmance of denial of rule 3.800(a) motion and remanding for reconsideration in light of our decision quashing another district court affirmance). There are equal if not more compelling grounds for correcting illegal convictions under the narrow criteria of Fiore.

I. THE CONTENT OF THE COMMON POCKETKNIFE EXCEPTION WHEN BUNKLEY'S CONVICTION BECAME FINAL
Under the facts relied upon by the United States Supreme Court in its review of *920 our decision in Bunkley I, this Court in its review of the Second District decision, and the Second District in its review of the denial of Bunkley's postconviction motion, Bunkley's pocketknife fit within the "common pocketknife" exception at the time his conviction became final. The statute containing the common pocketknife exception remained unchanged between 1989, when Bunkley's conviction became final, and 1997, when this Court decided L.B. Thus, the common pocketknife exception was not any narrower when Bunkley's conviction became final than when this Court decided L.B. This conclusion is illuminated by revisiting both L.B. and district court precedent addressing the common pocketknife exception, and by correctly identifying the roles played by this Court and the district courts of appeal in defining and applying the law of the state.

A. The "Common Pocketknife" Exception as Defined by L.B.

As the United States Supreme Court recognized, Florida law has exempted common pocketknives from the statutory definition of a weapon since 1901, in language unchanged since the exception became law. See Bunkley II, 123 S.Ct. at 2021; see also Bunkley I, 833 So.2d at 743. The statutory language in effect when Bunkley's conviction became final in 1989 was identical to the statutory language at the time of L.B.'s conviction in 1995.[29] Under the construction of this language adopted in L.B., Bunkley was improperly convicted of the crime of armed burglary, which incorporated the statutory definition of a weapon, for his possession of a knife that was a common pocketknife as a matter of law.
The due process concern in this case is identical to Fiore. In a decision in another case issued after Fiore's conviction became final, the Pennsylvania Supreme Court clarified that the statute under which Fiore was prosecuted and convicted did not prohibit Fiore's conduct. That decision "was not new law" but rather a clarification of what the law had always been. Thus, Fiore did not present an issue of retroactivity. See 531 U.S. at 228, 121 S.Ct. 712. However, because the Pennsylvania Supreme Court's clarification stated the law at the time of Fiore's conviction, the United States Supreme Court held that Fiore's conviction violated due process. See id.
When the issue of the definition of a common pocketknife first came before this Court in 1997 in L.B., we were not called upon to reconsider any previous decision of this Court. Rather, we were reviewing a decision in which the Second District had declared the common pocketknife exception to the statutory definition of weapon void for vagueness. Despite the majority's statement in Bunkley I to the contrary, see 833 So.2d at 745, in quashing the Second District decision we did not rely on any "evolutionary process" in judicial constructions of the statutory common pocketknife exception. Rather, to save the term "common pocketknife" from unconstitutional vagueness, we relied not only on the 1951 Attorney General's definition of "common pocketknife," as the majority points out, but also on a 1986 dictionary definition from Webster's Third New International Dictionary. See L.B., 700 So.2d at 372-73; *921 see also Francis v. State, 808 So.2d 110, 138 (Fla.2001) (stating in parenthetical cite to L.B. that this Court relied on dictionary definition in responding to vagueness challenge).[30]
In L.B., we clarified a statute that had recognized, without any change, the "common pocketknife" exception for decades. Our holding was not a change in the law but rather an explanation of what the law had always been. L.B. stands for the proposition that a folding knife with a blade of less than four inches which is carried in a folded position is a "common pocketknife" as a matter of law within the meaning of section 790.001(13). Our holding in L.B. is consistent with the intent of the Legislature in exempting common pocketknives from the definition of weapon, as recognized by the Third District Court of Appeal as early as 1974:
Obviously the legislature, by excepting common pocket knives from the category of weapons, the carrying of which would be a crime, did so in order that the carrying of a common pocket knife by a citizen should not constitute a crime, in view of the general custom of people to carry such knives for convenience and useful purposes unrelated to any criminal intent or activity.
State v. Nixon, 295 So.2d 121, 122 (Fla. 3d DCA 1974); see also L.B. v, State, 681 So.2d 1179, 1180 (Fla. 2d DCA 1996).

B. Relevant Facts of L.B. and Bunkley

Due process requires that the clarification of the common pocketknife exception in L.B. be applied in this case because there was no evidence that the pocketknife Bunkley possessed was in any way related to his offense of burglary. The material facts of L.B. match the facts relied upon first by the Second District in Bunkley's postconviction appeal, then by this Court in Bunkley I, and finally by the United States Supreme Court in Bunkley II. Each defendant carried in the folded position a common pocketknife with a blade of less than four inches in length. See Bunkley I, 833 So.2d at 741; L.B., 700 So.2d at 373. We ordered the defendant in L.B. discharged on the weapon offense, while Bunkley remains imprisoned pursuant to the weapon enhancement to his burglary conviction under this Court's decisions in his case.
Even with the addition of testimony describing Bunkley's knife as a buck knife now relied upon by the majority, the holding in L.B. remains applicable because, as reflected in the Second District opinion in that case, the knife in L.B. was also described as a buck knife. See 681 So.2d at 1180.[31] Although additional testimony indicated *922 that Bunkley's knife had a locking blade and was "a little bit larger than a natural pocketknife," its blade was shorter than the four-inch threshold established in L.B. for common pocketknives.[32] Further, Bunkley testified that his reason for having the knife was to cut roofing materials. Accordingly, under the facts relied upon by the majority in either our previous or current review of this case, Bunkley's knife, which was not described as having a hilt guard or notched handle, was a "common pocketknife." Cf. J.D.L.R. v. State, 701 So.2d 626 (Fla. 3d DCA 1997) (holding that a knife with a 3-3/4 inch pointed blade, notched handle and large metal hilt guard was not a common pocketknife). Therefore, the clarification of the common pocketknife exception in section 790.001(13) in L.B. applies directly to Bunkley.

C. District Court Decisions Under Section 790.001(13)
In characterizing the applicability of the common pocketknife exception as a jury question when Bunkley's conviction became final, the majority relies on district court decisions concerning the definition of a weapon in section 790.001(13). The majority focuses on State v. Ortiz, 504 So.2d 39, 40 (Fla. 2d DCA 1987), in which the Second District held that it was a jury question whether a knife with a four-inch folding blade was a weapon, and on cases that cite Ortiz but in which the "common pocketknife" exception was not in issue. See Baldwin v. State, 857 So.2d 249, 252 (Fla. 2d DCA 2003) (holding that defendant's firearm could not be included in the definition of "concealed weapon" because chapter 790 specifically excludes firearms from the definition of "weapon"), review dismissed, 865 So.2d 479 (Fla.2003); Mitchell v. State, 698 So.2d 555, 561 (Fla. 2d DCA 1997) (acknowledging that case law tends to make the issue of whether a BB gun is a deadly weapon a jury question), approved, 703 So.2d 1062 (Fla.1997); Bell v. State, 673 So.2d 556, 557 (Fla. 1st DCA 1996) (stating that whether defendant's "knife" constituted a weapon was a jury question without discussing statutory exception for pocketknives). In its reliance on post-L.B. precedent citing Ortiz, the majority fails to distinguish cases in which the common pocketknife was not used in the course of another offense from cases where, depending on the manner of use, even a common pocketknife could become a weapon and the issue was therefore properly submitted to the jury. As the Third District recognized in reversing the dismissal of a prosecution for aggravated assault with a deadly weapon in Nixon, the Legislature's exclusion of common pocketknives from the definition of weapon
does not mean that a pocketknife cannot be a deadly weapon. Whether an object used as a weapon in an assault is a deadly weapon is a factual question to be resolved by the finder of facts at trial and is to be determined upon consideration of its likelihood to produce death or great bodily injury.
295 So.2d at 122 (citation omitted).
Neither L.B. nor Bunkley I addressed a situation in which a folding knife was carried *923 in an open position, brandished, or otherwise used in a manner likely to cause death or great bodily harm. Moreover, we specifically declined in L.B. to "consider whether a pocketknife with a blade-length in excess of four inches can be considered a `common pocketknife.'" 700 So.2d at 373 n. 4.[33] Therefore, after our decision in L.B., as before, the question of whether a knife with a folding blade is a "common pocketknife" is a fact question for the jury where the blade exceeds four inches or the knife is carried in an open position or brandished. See Porter v. State, 798 So.2d 855, 856 (Fla. 5th DCA 2001) (holding that it was a jury question whether a pocketknife carried in an open position was a deadly weapon for purposes of the crime of possession of a weapon by a convicted felon); Arroyo v. State, 564 So.2d 1153, 1155 (Fla. 4th DCA 1990) (recognizing that pocketknives could be deadly weapons when used in a manner likely to produce death or great bodily harm); McCoy v. State, 493 So.2d 1093, 1094 (Fla. 4th DCA 1986) (concluding it was a jury question whether defendant who waved around a "small" pocketknife could be convicted of assault with a deadly weapon).
Consequently, the majority's conclusion that the question of whether Bunkley's pocketknife constituted a weapon was properly submitted to the jury is incorrect. Just because some district court opinions before L.B. can be found that affirmed a conviction of a weapon offense or enhancement that had been submitted to the jury does not mean that it was proper as a matter of law to do so in cases where the "weapon" was a common pocketknife and the pocketknife was not used or brandished as a weapon. Submission of the case to the jury under these circumstances certainly was not the law of the state. As the majority demonstrates in its reliance on Ortiz, it was at most the law of the Second District. Therefore, no district court decision preceding our decision in L.B. set forth the established law of the state such that L.B. constituted a change, rather than a clarification, of the law of the state.
L.B.'s status as a first-time declaration of the law of the state is easily demonstrated. The majority relies on the Second District decision in Ortiz as the precedent governing Bunkley's case at the time his conviction became final in 1989. In 1990, three years after Ortiz, the Fourth District held in a case similar to Bunkley's that the trial court erred in submitting a charge of attempted burglary with a dangerous weapon to the jury based on evidence that the defendant had an open pocketknife that was not used in a manner likely to produce death or great bodily injury. See Arroyo, 564 So.2d at 1155. The court in Arroyo, relying on the 1974 decision by the Third District in Nixon, held that the pocketknife was not a dangerous weapon under the facts of the case, and directed the trial court to reduce the conviction to attempted burglary. See id. Nine years after its decision in Ortiz, the Second District concluded in L.B. that "[t]his case and others before this court" demonstrated that the common pocketknife exception was unconstitutionally vague and its application could no longer be left to the "whim of a jury." L.B., 681 So.2d at 1180 (quoting *924 Curris v. State, 647 So.2d 227, 229 (Fla. 2d DCA 1994)). Thus, Ortiz was not the law of the state at the time Bunkley's conviction became final, and was no longer even the law of the district that issued it by the time L.B. reached this Court. Instead, Ortiz was merely one of the myriad decisions in which district courts reached different conclusions in reviewing convictions before the issue of the proper interpretation of the "common pocketknife" exception reached this Court.
The Second District's determination in L.B. that section 790.001(13) was unconstitutionally vague provided this Court with the first opportunity to address the "common pocketknife" exception. We have mandatory jurisdiction of decisions that declare state statutes unconstitutional. See art. V, § 3(b)(1), Fla. Const. This Court's decision in L.B. alone established the law of the state that bound all Florida trial and appellate courts on the meaning of the common pocketknife exception.

II. IS FIORE EVER APPLICABLE IN FLORIDA?
Although this Court applied Fiore in State v. Klayman, 835 So.2d 248 (Fla.2002), to require the reversal of a final conviction of a drug trafficking offense, Justice Wells remains committed to his position in his dissent in Klayman that Fiore has no application in Florida. I respond to his contentions below.

A. Roles of the Different Appellate Courts
Consistent with his dissenting opinion in Klayman, Justice Wells asserts that L.B. was a nonretroactive change in the law, rather than a clarification subject to Fiore. According to Justice Wells, because a decision of a district court is binding upon all Florida trial courts in the absence of interdistrict conflict, this Court in reviewing district court decisions can only change, rather than clarify, the law. In Justice Wells' view, Fiore can never apply in Florida because of the different appellate court structure in this State.
I disagree, not only because Fiore is based on constitutional principles of due process of law but also because Justice Wells' description of the roles played by this Court and the district courts of appeal is incomplete. As the Second District has recognized, the function of the district courts in interpreting the law of the state is secondary to its primary function of error correction:
Under our present constitutional scheme, the district courts of appeal engage primarily in the so-called error-correcting function to insure that every litigant receives a fair trial. This frees the supreme court to discharge its judicial policy-making function of clarifying the law and promulgating new rules of law.
Whipple v. State, 431 So.2d 1011, 1014 (Fla. 2d DCA 1983). Therefore, although the principle that a district court decision can be binding on trial courts outside that district guides trial courts on what law to follow under certain circumstances, it does not diminish this Court's power to authoritatively interpret the law when conflict arises or constitutional issues are at stake. A district court decision is never binding on this Court or another district court.
Differences in the structure of the Pennsylvania and Florida court systems, on which Justice Wells relies, do not warrant a contrary conclusion. It is true that this Court's discretionary review authority is more circumscribed than that of the Pennsylvania Supreme Court, which issued the decision clarifying the law of that state and requiring the reversal of Fiore's conviction. Compare 42 Pa. Cons.Stat. Ann. § 724 (West 2004) (providing that final orders of the Superior Court and Commonwealth *925 Court "may be reviewed by the Supreme Court upon allowance of appeal by any two justices of the Supreme Court upon petition of any party to the matter") with art. V, § 3(b)(3)-(4), Fla. Const. (authorizing discretionary review of only those district court decisions that meet specific criteria). But the difference in how cases can reach the high courts of Florida and Pennsylvania is of no significance to the authority of decisions made by these courts. Florida and Pennsylvania are among the great majority of states that have intermediate appellate courts to facilitate the prompt administration of justice. In this type of system, the existence of mid-level courts does not diminish the authority of the state's highest court to interpret the law, resolve conflicts among lower courts, and determine issues of constitutional stature or statewide importance.
The fact that district courts, performing their primary function of error correction, dispose of most criminal appeals without opinion further weighs against precluding the application of Fiore in Florida. In a recent year (July 1, 1998 to June 30, 1999), district courts issued per curiam affirmances (PCAs), which are not directly reviewable by this Court, in 69.2 percent of all criminal appeals, and citation PCAs, which are reviewable only if at least one of the cases cited is under review by this Court, in another 6.9 percent of criminal appeals. See Judicial Management Council, Final Report and Recommendation, Committe on Per Curiam Affirmed Decisions Appendix D-6 (May 2000) (available on this Court's website at h ttp:// www.flcourts.org/sct/sctdocs/bin/pca-report.pdf.).
The availability and prevalence of the PCA means that a district court could issue an opinion construing a provision such as section 790.001(13) against a defendant and then affirm all other appeals raising that issue through a PCA. In fact, the Second District issued a PCA in Bunkley's direct appeal. See Bunkley v. State, 539 So.2d 477 (Fla. 2d DCA 1989). The court did not address any of the three issues raised by Bunkley concerning the weapon enhancement: (1) section 790.001(13) provided unconstitutionally inadequate notice that his pocketknife was statutorily defined as a weapon  the very issue subsequently addressed by the Second District in L.B.; (2) the evidence was insufficient to establish that he possessed a weapon, and (3) the trial court erred in instructing the jury that it could apply the weapon enhancement even if Bunkley did not use the knife during the burglary. Unless Fiore applies, litigants such as Bunkley who are precluded by a PCA from seeking discretionary review in this Court would never be able to obtain the benefit of a subsequent decision of this Court clarifying that their conduct was not prohibited. Fiore requires that the dictates of due process of law take precedence over the legitimate interest in the finality of district court decisions under these circumstances.

B. Klayman

In Klayman, this Court held that Fiore applied to a decision that had come before the Court on certified conflict. We determined that a defendant could not be legally convicted of drug trafficking under the law as properly interpreted. Specifically, this Court held in Klayman that this Court's decision in Hayes v. State, 750 So.2d 1 (Fla.1999), was a clarification of extant law under Fiore and that Klayman was entitled to the benefit of that subsequent clarification of the drug trafficking statute. See Klayman, 835 So.2d at 254-55.
Until we decided Hayes, a defendant possessing an identical amount of tablets containing hydrocodone under identical circumstances could be convicted of drug *926 trafficking in the Fourth and Fifth Districts but not in the First and Second Districts.[34] Individuals convicted of drug trafficking are subject to a mandatory minimum term of imprisonment of twenty-five years and a mandatory fine of $500,000. See Hayes, 750 So.2d at 2 (citing section 893.135(1)(c)(1), Florida Statutes (Supp.1996)). On the other hand, under a proper interpretation of the provision the only possible crime by defendants possessing tablets containing 15 milligrams of hydrocodone would be unauthorized possession of a Schedule III substance, a third-degree felony punishable by a term of imprisonment not to exceed five years. See id., at 2 (citing section 893.13(1)(a)2, Florida Statutes (Supp.1996), and section 775.082(3)(d), Florida Statutes (1995)).
The effect of our opinion in Hayes was to provide a clarified definition of trafficking in hydrocodone which excluded conduct under which defendants in the Fourth and Fifth Districts had been convicted. This is why this Court properly held in Klayman that Hayes was a clarification of the drug trafficking statute that, under Fiore, applied to a defendant whose conviction of trafficking in hydrocodone became final before the decision in Hayes.

C. Applying Fiore and Klayman to Bunkley's case
In this case, the majority's determination that the issue decided in L.B. was a jury question at the time of Bunkley's trial, and therefore that L.B. was a nonretroactive change in the law rather than a clarification, is contrary to Fiore and inconsistent with Klayman. I agree with Justice Wells that the inconsistency cannot be justified by any distinction between statutes that cede discretion to the courts and those that employ precise language. See concurring op. at 54. L.B., which construed the common pocketknife exception to the definition of deadly weapon, is no less a clarification of the law than Hayes. However, as previously stated, unlike Justice Wells, I cannot conclude that district court decisions before L.B. created the law of the state that made L.B. a change in the law and render Fiore, and hence Klayman, inapplicable to convictions that were final when L.B. was issued.
Extending Fiore to this case would not have a profoundly detrimental effect on our criminal justice system, as Justice Wells suggests. Quite the opposite. Our citizens expect that a defendant should not be incarcerated for conduct that the law does not prohibit. Further, there are critical limitations to the application of Fiore. Fiore applies strictly to first-time statutory clarifications by a state's highest court. In comparison, under Witt v. State, 387 So.2d 922 (Fla.1980), a decision overruling or receding from our prior precedent can be held to apply retroactively to final convictions. Additionally, Fiore applies only to those first-time clarifications that interpret a statutory offense under which the State has been allowed "to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." 531 U.S. at 229, 121 S.Ct. 712.
Because of its narrow criteria, I believe that relatively few district court decisions will be overturned pursuant to the stringent standards of Fiore. Moreover, any *927 impact on finality of decisions caused by Fiore is minimal in contrast to the significant due process concerns of incarcerating an individual for conduct that was in fact never criminal under the statute as properly clarified. Regarding the concern that trial courts will be unduly burdened, granting relief in this case would not compel a retrial. Bunkley's conviction would be reduced to simple burglary and his sentence adjusted accordingly, akin to the discharge for possession of a weapon on school grounds ordered in L.B. As this Court has stated in applying the Witt test of retroactivity, "[i]n the limited number of decisions that are retroactively applied, we have determined that concerns for basic fairness and uniformity of treatment among similarly situated defendants outweigh any adverse impact that retroactive application of the rule might have on decisional finality." Dixon v. State, 730 So.2d 265, 267 (Fla.1999). The same considerations apply to decisions meeting the narrow criteria of Fiore.

III. CONCLUSION
For the reasons explained above, I conclude that pursuant to Fiore, Klayman, and L.B., Bunkley was convicted of armed burglary based on conduct that the burglary and weapon statutes, "as properly interpreted, do [ ] not prohibit." See Fiore, 531 U.S. at 228, 121 S.Ct. 712. The instruction given during Bunkley's trial did not include the clarified definition of "common pocketknife" that we employed in L.B. Additionally, when the jury requested further instructions concerning the use of the weapon, the trial court instructed the jury that
the fact that the defendant does not actually employ the weapon is not the gravamen of this enhanced offense. There is no requirement that the State must show the person charged intended or was willing to use such weapon in the furtherance of the crime being committed.
Under L.B., this instruction was an incorrect statement of the law as to folding knives falling within the "common pocketknife" exception.
The United States Supreme Court observed that under the facts on which this Court decided Bunkley I, if "Bunkley's pocketknife fit within the `common pocketknife' exception to § 790.001(13) in 1989, then Bunkley was convicted of a crime for which he cannot be guilty  burglary in the first degree." Bunkley II, 123 S.Ct. at 2023. This is exactly what occurred in this case. Bunkley's folding knife with a blade of less than four inches in length fit within the common pocketknife exception in 1989, as subsequently clarified by this Court's decision in L.B., as a matter of law.
Fundamental fairness, as expressed through the constitutional guarantee of substantive due process of law, should preclude Bunkley from serving out a life sentence for conduct that at all times material to his prosecution and conviction did not constitute the crime of armed burglary. Today, the Court again upholds the conviction that will result in Bunkley spending the rest of his life in prison for "armed" burglary with a common pocketknife. For the reasons explained herein, I dissent.
ANSTEAD, C.J., concurs.
NOTES
[1] The dissent asserts that the instructions given to Bunkley's jury were erroneous in light of L.B. v. State, 700 So.2d 370 (Fla.1997). However, the jury instructions correctly stated the law at the time of Bunkley's trial. The trial court, without objection, instructed Bunkley's jury that a "dangerous weapon" is "any weapon that, taking into account the manner in which it is used, is likely to produce death or great bodily harm." No additional or special instructions were requested by the defendant. When the jury itself requested further instructions concerning the use of the weapon, the trial court instructed the jury: "The fact that the defendant does not actually employ the weapon is not the gravamen of this enhanced offense. There is no requirement that the State must show the person charged intended or was willing to use such weapon in the furtherance of the crime being committed." Bunkley's counsel objected to this additional instruction solely on the ground that the standard jury instructions were adequate. The court overruled the objection based on State v. Rodriguez, 402 So.2d 86, 86 (Fla. 3d DCA 1981) (holding that the burglary statute authorizes an increased penalty where the burglar is armed, and the fact that the defendant does not actually use the weapon is "not the gravamen of this enhanced offense"). Bunkley offered no case law to contradict Rodriguez. In fact, Bunkley had no legal ground on which to challenge the supplemental jury instruction. The holding of Rodriguez is consistent with the armed burglary statute, which provides a maximum penalty of life in prison where a burglar either commits an assault or battery, or where a burglar commits a burglary while armed with a dangerous weapon. See 810.02(2)(a), (b), Fla. Stat. (1985). For a conviction of armed burglary, there is no statutory requirement that an armed burglar use the weapon. Thus, Bunkley's jury was properly instructed. In any case, in Bunkley's petition to this Court, Bunkley did not renew his objection to the jury instructions. Therefore, the correctness of the jury instructions is not an issue before this Court.
[2] At this point, Bunkley's conviction and sentence became final. The Florida Supreme Court has no subject matter jurisdiction over such decisions because such an affirmance without opinion by a district court in Florida constitutes a "decision of the highest state court empowered to hear the cause." Florida Star v. B.J.F., 530 So.2d 286, 287 (Fla.1988).
[3] The juvenile in L.B. was charged with possession of a weapon on school property in violation of section 790.115(2), Florida Statutes (1995). Unlike Bunkley's crime, there was no underlying offense to which the possession of a weapon was an enhancement. However, the same definition of "weapon" which excluded a "common pocketknife" was at issue.
[4] The dissent erroneously characterizes this Court's decision in L.B. as having clarified the definition of a "common pocketknife" in order to save the term from constitutional vagueness, and thus argues that our decision in L.B., although it came seven years after Bunkley's conviction became final, must apply to Bunkley's case. If L.B. had declared the weapons statute unconstitutional but for a saving construction, we would have evaluated the statute's application to Bunkley on that basis. However, that is not what L.B. held. To the contrary, a review of L.B. reveals that this Court upheld the statutory term "common pocketknife" as sufficiently clear to "provide persons of ordinary intelligence with fair notice as to what constitutes forbidden conduct," and therefore not unconstitutionally vague. Id. at 371-72.

In determining that the "common pocketknife" exception is facially constitutional, we stated in L.B. that "in the vast majority of cases, it will be evident to citizens and fact-finders whether one's pocketknife is a `common' pocketknife under any intended definition of that term." Id. at 372. We assumed for the sake of argument that "in some peripheral cases it may not be clear whether a particular pocketknife is a `common' pocketknife." Id. However, we said "that reason alone is insufficient to strike a statute as unconstitutionally vague." Id. We emphasized that "even if judges and juries were prone to reach inconsistent conclusions as to which knives are `common pocket knives' under section 790.001(13), the statute still would not be rendered unconstitutional." Id. We cited for support the United States Supreme Court's statement in Roth v. United States, 354 U.S. 476, 492 n. 30, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957):
It is argued that because juries may reach different conclusions as to the same material, the statutes must be held to be insufficiently precise to satisfy due process requirements. But, it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system.
700 So.2d at 373 (quoting Roth, 354 U.S. at 492 n. 30, 77 S.Ct. 1304). Finally, we concluded in L.B. that "in the vast majority of cases it will be evident whether one's particular knife is a `common pocketknife'"; therefore, we held that "section 790.001(13) is not void for vagueness." Id. Thus, without resort to a saving definition, this Court in L.B. held that the statutory "common pocketknife" exception at issue in Bunkley's case was not unconstitutionally vague.
[5] The dissent asserts that Fiore mandates the relief Bunkley seeks because "the constitutional principles are identical." We disagree. This case is fundamentally different from Fiore. In Fiore, the State failed to present any evidence on a basic element of the crime. Fiore was convicted under a Pennsylvania statute that prohibited operating a "hazardous waste facility without a permit." Fiore, 531 U.S. at 226, 121 S.Ct. 712. The United States Supreme Court in Fiore noted the Pennsylvania Supreme Court's ultimate determination that the Commonwealth presented no evidence to prove a basic element of the crime for which Fiore was convicted, i.e., the failure to possess a permit; instead, the Commonwealth conceded that Fiore did possess a permit. Fiore, 531 U.S. at 229, 121 S.Ct. 712. Unlike Fiore, sufficient evidence was adduced at Bunkley's trial on every element of his crime, including the dangerousness of his weapon, for his jury to find proof of guilt beyond a reasonable doubt. Specifically, the State presented evidence and proved to a jury that he not only possessed a knife, but that this knife was a dangerous weapon and not a common pocketknife. Therefore, this case is distinct from Fiore because there was no failure of proof under the applicable procedural or substantive law of 1989 as to any element of Bunkley's offense. Consequently, Bunkley's Fourteenth Amendment due process rights were not violated.
[6] In Fiore terms, this question can be stated as: Whether a decision of this Court construing a statute contrary to a construction of a district court of appeal changes the law or whether such construction clarifies the law.
[7] For an excellent and thorough review of the Florida court structure, see John M. Scheb, Florida's Courts of Appeal: Intermediate Courts Become Final, 13 Stetson L.Rev. 479 (1984).
[8] Id. at 489.
[9] Justice Pariente, in her dissent, by referring to Florida's appellate courts as "intermediate courts" and "mid-level courts," diminishes the role of Florida's district courts of appeal but cites no precedent from this Court in support of her assertion. Nor does she or could she correctly contest that Ansin has been the authoritative precedent of this Court for the past forty-six years, that Florida's district courts of appeal are not intermediate courts, and that review by the district courts in most instances is "final and absolute." Ansin is expressly contrary to Justice Pariente's assertion. Moreover, the essence of the amendments to article V of the Florida Constitution in 1980 was to reinforce the intended finality of the decisions of the district courts of appeal. See Scheb, supra note 7.
[10] Scheb, supra note 7, at 485.
[11] Report of the Supreme Court Commission on the Florida Appellate Court Structure, 53 Fla. B.J. 279, 279-284 (1979).
[12] Significantly, in this Court's proposed amendment to article V, this Court included a provision allowing it on its own initiative to "reach down" and grant review of trial court orders and district court decisions of substantial statewide importance that required immediate judicial resolution. The Legislature, however, declined to propose this provision. The Appellate Structure Commission, which drafted the proposal that was ultimately adopted by the voters as an amendment to the Florida Constitution in 1980, also did not include "reach down" jurisdiction. Scheb, supra note 7, at 490-91.
[13] The Florida Supreme Court's mandatory jurisdiction is thus limited to:

1. Trial court judgments imposing the death penalty;
2. District court decisions invalidating a state statute or provision of the state constitution;
3. Administrative actions of statewide agencies relating to utility service and rates as provided by law; and
4. Bond validations by trial courts as provided by law.
Scheb, supra note 7, at 492 (footnotes omitted). The court's discretionary jurisdiction is restricted to review of:
1. Decisions of district courts expressly declaring a state statute valid; or expressly construing a provision of state or federal constitutions;
2. Decisions of district courts expressly affecting a class of constitutional or state officers;
3. Decisions of district courts expressly and directly conflicting with one another or with the supreme court on the same question of law;
4. Decisions of a district court which pass upon a question certified by it to be of great public importance, or that are certified by it to be in direct conflict with decisions of another district court;
5. Trial court orders and judgments certified by a district court where the appeal is pending to be of great public importance or to have great effect on administration of justice throughout the state and to require immediate resolution by the supreme court; and
6. Questions of law certified by the United States Supreme Court or the United States Court of Appeals determinative of a cause of action where there is no controlling precedent of the Supreme Court of Florida.
Id. (footnotes omitted).
[14] For an extensive analysis on this issue, see Gerald Kogan and Robert Craig Waters, The Operation and Jurisdiction of the Florida Supreme Court, 18 Nova L.Rev. 1151 (1994). As stated in Gerald B. Cope, Jr., Discretionary Review of the Decisions of Intermediate Appellate Courts: A Comparison of Florida's System with Those of the Other States and the Federal System, 45 Fla. L.Rev. 21 (1993):

What is striking about the four jurisdictional categories is an omission: the supreme court is not empowered to grant review under this subdivision on account of the importance of the question presented. Plainly, the supreme court's four discretionary review categories do not exhaust the universe of important legal issues which the state's highest court should be empowered to resolve. For example, a question of first impression by definition does not conflict with other decisions; unless the issue happens to involve constitutionality, constitutional interpretation, or a class of constitutional or state officers, the supreme court cannot on its own grant discretionary review. Similar examples include cases of statutory interpretation, decisions affecting a common law right, and cases calling for reconsideration of existing precedent. Regardless of the significance of the legal issue, the supreme court may not grant discretionary review unless the case falls into one of the four categorical pigeonholes or unless the district court of appeal has granted permission, an alternative explained in the next section.
....
Unlike most states, Florida has no general criterion of importance which can be invoked at the supreme court level. Unless there is also a conflict of decisions, a constitutional issue, or a matter affecting a class of constitutional or state officers, jurisdiction may not be invoked on petition to the supreme court. The Florida system allows importance-based discretionary review only when a district court of appeal grants permission through its certification of a question of great public importance.
Id. at 37-38, 53 (footnotes omitted) (emphasis added).
[15] This apparently differs from the practice in the federal courts, where a decision of a court of appeals is binding only on the lower trial courts within that particular circuit. Hart v. Massanari, 266 F.3d 1155 (9th Cir.2001).
[16] The plain fact is that the Florida Constitution has made a nonconflicted decision of a district court the law of all of Florida, and this Court has uniformly recognized this fact in its construction of the Florida Constitution since 1957, and commentators have acknowledged this fact in their articles. See supra notes 7, 14.

The amendments in 1980 to article V of the Florida Constitution were for the purpose of reinforcing the finality of the decisions of the district courts. See Scheb, supra note 7. Justice Pariente's statements concerning per curiam affirmances in fact underscore the intended and recognized finality of district court decisions under Florida's constitutional court structure. It necessarily follows under this constitutional structure that when decisions of the district courts provide the Florida Supreme Court with jurisdiction in cases of statutory construction, and the Court makes a decision contrary to the district court decision as to statutory construction, the Florida Supreme Court has changed the law.
[17] Justice Pariente does not acknowledge this series of cases. Justice Ehrlich's opinion in Bass v. State, 12 Fla. L. Weekly 289 (Fla. June 11, 1987), withdrawn, 530 So.2d 282 (Fla.1988), is correct as to the law and its analysis at the end of this series of cases is recognized as being correct and is directly contrary to Justice Pariente's opinion.
[18] Kogan and Waters, supra note 14, at 1200, 1227.
[19] The convictions in these cases were final because there was no basis under the Florida Constitution for this Court to review the district courts' decisions.
[20] My dissent in Klayman discussed these cases.
[21] Justice Pariente's dissenting opinion discussed Klayman.
[22] As is seen by reading the cases that I have cited, the statement in Klayman that Florida courts have not previously recognized the Fiore distinction between a "clarification" and a "change" is not accurate. Rather, in Bass, Hall, and McCuiston, the distinction was expressly recognized, debated, and decided in favor of this Court's latter decision being a change in the law. That is exactly the point Justice Ehrlich made in his dissent in the first opinion in Bass, which was explained by Judge Zehmer in Hall, and which resulted in the rehearing in Bass and the answering of that certified question in the negative in Hall.
[23] See Cope, supra note 14.
[24] The statute in Bunkley's case was in effect for almost 100 years.
[25] See Cope, supra note 14.
[26] Justice Pariente fails to accept without a reasonable explanation as to how it would be avoided, the reality of opening, based upon statutory construction, cases which have been considered final for twenty, thirty, forty, or more years.
[27] During the entire 103-year period in which weapon has been statutorily defined, the definition has excluded the "common pocketknife." See Bunkley II, 833 So.2d at 743 n. 5.
[28] As to the "common pocketknife" exception, there appear to be no other cases in which a defendant is challenging a final conviction on the basis of L.B.
[29] Section 790.001(13), Florida Statutes (1995), provides:

"Weapon" means any dirk, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, or other deadly weapon except a firearm or a common pocketknife.
Section 790.001(13), Florida Statutes (1987), provides:
"Weapon" means any dirk, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, or other deadly weapon except a firearm or a common pocketknife.
[30] The majority is incorrect in stating that the construction adopted by this Court in L.B. was not necessary to save the "common pocketknife" exception from being held unconstitutional. Reviewing a district court decision declaring the statutory term void for vagueness, this Court held in L.B. that when clarified by the four-inch blade threshold, the common pocketknife exception was not unconstitutionally vague. See id. at 373. This was clearly a saving construction, akin to State v. Iacovone, 660 So.2d 1371, 1373 (Fla.1995), in which we limited the statute authorizing a mandatory minimum sentence for attempted murder of a law enforcement officer to attempted first-degree murder. In State v. Stevens, 714 So.2d 347, 348 (Fla.1998), this Court held that its decision in Iacovone applied retroactively, partly because the "imposition of a hefty criminal sentence pursuant to a patently `irrational' sentencing scheme `could not withstand a due process analysis' of any sort." Id. In both L.B. and Iacovone, the Court construed statutes to avoid finding them unconstitutional without expressly acknowledging in either case that it was employing a saving construction.
[31] The implication of the majority's use of testimony describing Bunkley's knife as a "buck knife" is that the issue of whether Bunkley's knife is a common pocketknife remains a jury question, even after L.B. Today's decision therefore resurrects the very concern over the potential vagueness of the term "common" that prompted this Court to clarify the definition in L.B. with a bright-line rule.
[32] To the extent that in this remand the majority invokes facts different from those it previously adopted from the Second District's statement of facts, the majority alters the law of the case and answers a question different from the question posed by the United States Supreme Court, which also relied on the description of Bunkley's knife as a common pocketknife.
[33] The precise statement in our footnote in L.B. is as follows:

We note that neither the Attorney General nor this Court maintains that four inches is a bright line cutoff for determining whether a particular knife is a "common pocketknife." We merely hold that appellant's knife fits within the exception to the definition of weapon found in section 790.001(13). We decline to consider whether a pocketknife with a blade-length in excess of four inches can be considered a "common pocketknife."
700 So.2d at 373 n. 4 (emphasis supplied).
[34] Resolving a certified interdistrict conflict, this Court in Hayes determined that an individual could not be convicted of drug trafficking if the individual possessed tablets containing hydrocodone in amounts of less than 15 milligrams per dosage unit. See 750 So.2d at 5. In so holding, we quashed a decision of the Fourth District and disapproved a decision of the Fifth District. We also approved decisions by the First and Second Districts holding that defendants possessing tablets with less than 15 milligrams of hydrocodone per dosage unit could not be convicted of drug trafficking. See id.